# United States Court of Appeals
## For the Eighth Circuit

_____

No. 11-3691

_____

United States of America

*Plaintiff - Appellee*

v.

Roger Bruce Bugh

*Defendant - Appellant*

_____

Appeal from United States District Court
for the District of Minnesota - St. Paul

_____

Submitted: October 18, 2012
Filed: December 20, 2012

_____

Before MURPHY, BYE, and SHEPHERD, Circuit Judges.

_____

SHEPHERD, Circuit Judge.

Based on the sale of a handgun to a confidential informant, a jury convicted Roger Bugh of being a felon in possession of a firearm, a violation of 18 U.S.C. §§ 922(g)(1) and 924(e)(1). The district court[1] sentenced Bugh to 188 months imprisonment pursuant to the Armed Career Criminal Act because Bugh had

_____

[1]The Honorable Patrick J. Schiltz, United States District Judge for the District of Minnesota.

previously been convicted of at least three violent felonies. See 18 U.S.C. § 924(e)(1). Bugh now appeals, raising several arguments related to the Government's investigation, the destruction of evidence, and his sentence. We affirm.

## I.

In late 2010, Roger Bugh met Troy Nowland through a mutual friend known as "Michael T." While Michael T. and Bugh were using the drugs Nowland had sold them, Nowland expressed concern for his safety. He was worried that as a drug dealer he could be the target of a robbery because of the large amounts of cash and drugs he carried. Hearing this, Bugh offered to sell Nowland a firearm which belonged to his former girlfriend for $500. Although Nowland agreed to buy the gun, he later decided a gun was unnecessary. As a result, when Bugh called Nowland to set up the sale, Nowland declined.

Approximately two weeks later, Officer Mark Nelson, a member of St. Paul, Minnesota's narcotics unit, arrested Nowland for distributing methamphetamine. Officer Nelson told Nowland that if he provided three criminal targets, then Nowland would receive favorable sentencing and charging considerations.[2] After agreeing to work with the Government, Nowland offered Bugh as a potential target. Even though he had never heard of Bugh, Officer Nelson was interested because of Bugh's criminal history and access to a gun. While Officer Nelson was recording the conversation, Nowland called Bugh on the day of his arrest, January 6, 2011. Bugh answered and agreed to sell the gun. Although he could not deliver the gun that day because he did not have a car, Officer Nelson decided to continue pursuing Bugh.

---

[2]Nowland was ultimately never charged for his illegal conduct on January 6, 2011, because of his work as a confidential informant.

On January 11, 2011, Officer Nelson, along with other law enforcement agents, met Nowland at a motel in St. Paul to set up the sale. Once the operation was in place, Nowland called Bugh and asked him to deliver the gun to the motel. Bugh had seen the gun since they last spoke, and told Nowland that it was "nicer than [he] thought." It was a brand new, "real . . . high shot" gun with a two-and-a-half inch barrel, according to Bugh. Bugh agreed to sell the gun, but had to get it from his former girlfriend. In the end, Bugh did not bring the gun to Nowland that day. Not only did Bugh have a meeting with his parole officer that morning, his former girlfriend never brought him the gun. After trying to set up the sale for several hours, Officer Nelson and the other officers decided to end the operation for the day, but continued pursing Bugh.

After subsequent conversations between Bugh and Nowland, Officer Nelson planned another operation which would take place near a gas station on January 19, 2011. When Nowland called Bugh to purchase the gun, Bugh did not answer. Bugh returned Nowland's call a few minutes later and told Nowland he was "trying to get a . . . ride over to" his former girlfriend's house, so "hold tight." His former girlfriend still had the gun, but Bugh had no way of picking the gun up from her house or transporting it to Nowland. After five phone calls between Bugh and Nowland, Bugh was unable to get the gun or find transportation. As a result, Officer Nelson ended the operation for the day.

The next day, Officer Nelson and other officers again put in place an operation at the same gas station to facilitate the purchase. Nowland and Bugh called each other eight times that day. Eventually, Bugh's former girlfriend borrowed a van and transported Bugh and the gun to the gas station. When Bugh and his former girlfriend arrived, Nowland was waiting in the parking lot with a concealed recording device. Officer Nelson was in a surveillance van a block away and approximately 12 officers were hiding around the gas station. Nowland entered the van and exchanged money for the gun. Then, Nowland alerted Officer Nelson with a prearranged signal that the

transaction was complete. At that point, officers swarmed the van with their guns drawn and seized the three individuals,[3] the money, and the gun. Bugh was arrested and taken to the county jail.

Based on the sale, a grand jury indicted Bugh with one count of being a felon in possession of a firearm. Bugh pled not guilty and proceeded to trial. At trial, the jury heard numerous audio recordings of phone conversations between Nowland and Bugh. Officer Nelson testified, however, that he erased the phone conversations he recorded on January 6, 2011. He stated: "I was actually surprised when I went to download all the calls that those calls weren't on the recorder, but they just weren't."

After the Government had presented all of its evidence and rested its case against Bugh, Bugh made a motion for judgment of acquittal and separate motions to dismiss the charge based on outrageous Government conduct, entrapment, and the intentional destruction of evidence. The district court denied all of Bugh's motions. Bugh presented no evidence and rested his case. Based upon a request by Bugh, the district court instructed the jury on the defense of entrapment,[4] despite the Government's objection. After receiving the jury instructions and deliberating, the jury found Bugh guilty of one count of being a felon in possession of a firearm. After trial, Bugh moved the court to either dismiss the indictment or grant a new trial based on outrageous Government conduct and the destruction of evidence. The district court denied Bugh's motion.

---

[3]Nowland was taken into custody so that Bugh and his former girlfriend would not know he was working as a confidential informant.

[4]The jury was instructed that the Government must prove the defendant was not entrapped beyond a reasonable doubt. Additionally, part of the entrapment instruction informed the jury: "If the defendant—before Troy Nowland began working for the government—did not have any intent or disposition to commit the crime charged and was induced or persuaded by the confidential informant to commit that crime, then the defendant was entrapped."

At sentencing, Bugh objected to portions of his presence report, arguing his non-residential burglary convictions should not count as violent felonies within the meaning of the Armed Career Criminal Act. The district court overruled Bugh's objection and found that Bugh had been convicted of four violent felonies, and, therefore, must be sentenced as an armed career criminal. The district court sentenced Bugh to 188 months imprisonment. Bugh appeals his conviction and sentence.

## II.

Bugh raises four points on appeal: (1) the Government failed to prove beyond a reasonable doubt that he was not entrapped, (2) the Government's investigation constituted outrageous government conduct, (3) Officer Nelson's destruction of audio recordings requires a new trial, and (4) the district court erred by sentencing Bugh as an armed career criminal. We discuss each issue in turn.

## A.

Bugh contends that the Government presented insufficient evidence to support the jury's conclusion that he was not entrapped. We review de novo the sufficiency of the evidence, resolving conflicts in the Government's favor, viewing the evidence in the light most favorable to the Government, and accepting reasonable inferences which support the verdict. United States v. Molsbarger, 551 F.3d 809, 812 (8th Cir. 2009).

The affirmative defense of entrapment is generally a question for the jury, not the court, because it requires factual determinations relating to the effect of the Government's conduct on a defendant. United States v. Myers, 575 F.3d 801, 805 (8th Cir. 2009). It has two elements: (1) the Government induced the crime, and

(2) the defendant was not predisposed to engage in the conduct. United States v. Abumayyaleh, 530 F.3d 641, 646 (8th Cir. 2008).

A defendant must demonstrate more than the Government soliciting, requesting, or approaching him with an opportunity for illegal conduct to establish inducement. United States v. Loftus, 992 F.2d 793, 798 (8th Cir. 1993). "When, as here, the government has not conceded the issue of inducement, the defendant's burden ought not be cast aside lightly."[5] See Myers, 575 F.3d at 806. Inducement takes many forms but requires "more than an opportunity to break the law. And it is well settled that the government may use artifice, stratagem, and undercover agents in its pursuit of criminals." Id. (internal citation omitted). The second element of entrapment—predisposition—considers if the defendant "was an unwary innocent or, instead, an unwary criminal who readily availed himself of the opportunity to perpetrate the crime." United States v. Berg, 178 F.3d 976, 980 (8th Cir. 1999) (internal quotation marks omitted). If the defendant is predisposed to commit the crime, then the entrapment defense fails. Id.

Bugh contends that the Government induced him into selling the gun and that he was not predisposed to commit the crime. The Government's evidence at trial, however, revealed that Bugh first proposed selling the gun to Nowland while using drugs at Michael T.'s house—before Nowland became a confidential informant—and eagerly pursued the gun sale as a willing participant. Indeed, the evidence shows

---

[5]The district court instructed the jury on the entrapment defense, placing the burden on the Government and implicitly finding that Bugh demonstrated that the Government induced him into committing the crime. See United States v. Young, 613 F.3d 735, 746 ("[T]o warrant an entrapment instruction, a defendant must first present evidence that the government induced the criminal conduct."). Our analysis, however, does not proceed directly to the issue of predisposition. See Myers, 575 F.3d at 806 n.4. Instead, the "starting point for our analysis is whether [Bugh] has established that the government induced him to violate the law." Id. at 805.

-6-

Bugh was only delayed by logistical difficulties, not second thoughts. Therefore, Bugh was not induced into selling the gun. It was his idea.

Bugh also argues that because he has never been arrested on a gun charge, he was not predisposed to possess a gun. The absence of a prior gun charge, however, does not necessarily indicate that Bugh was not predisposed to selling a firearm. See id. ("His never having 'cooked' such a large batch [of methamphetamine] need not necessarily mean he was not predisposed to do so.").

The jury rejected Bugh's entrapment defense. Because this is a determination best left to the jury, see Myers, 575 F.3d at 805, and because the evidence supported the jury's determination, we affirm.

B.

Next, Bugh contends that the Government's two-week investigation, the incentives provided to Nowland, and the destruction of evidence, taken as a whole, constitute outrageous Government conduct warranting dismissal of his charge. We review de novo whether Government conduct was sufficiently outrageous to require dismissal as a matter of law. United States v. Boone, 437 F.3d 829, 841 (8th Cir. 2006).

Outrageous Government conduct requires dismissal of a charge "only if it falls within the narrow band of the most intolerable government conduct." United States v. Morse, 613 F.3d 787, 792-93 (8th Cir. 2010). Law enforcement agents' conduct is so outrageous that due process principles bar the Government from using the judicial process to obtain a conviction only when agents' conduct violates "that fundamental fairness, shocking the universal sense of justice, mandated by the Due Process Clause of the Fifth Amendment." United States v. Russell, 411 U.S. 423, 432 (1973) (internal quotation marks omitted). Unlike the entrapment defense, which

focuses on the defendant's predisposition to commit the crime, the defense of outrageous conduct focuses on the Government's actions. United States v. Searcy, 284 F.3d 938, 942 (8th Cir. 2002).

Officer Nelson persuaded Nowland to reveal other criminals in exchange for favorable treatment. Similar to the defendant in United States v. King, 351 F.3d 859, 867 (8th Cir. 2003), Bugh "claims that the government allowed its informant [Nowland] to target [Bugh] for prosecution and essentially manufactured the crimes for which [Bugh] was convicted." Informants, however, are "the nature of the beast in police investigations," and "[s]uch realties do not rise to the level of outrageousness needed to support a due process violation." Id. at 868. Officer Nelson used Nowland, a low-level drug dealer, to find worse criminals and was interested in Bugh because he had offered to sell Nowland a gun. Officer Nelson continued pursuing the investigation after the operations on January 11 and January 19 failed because Bugh was still eager to sell the gun. The Government's conduct in this case represents an aggressive and persistent investigation, not outrageous conduct that shocks the conscience.

C.

Bugh argues that the destruction of audio recordings of the phone call made from Nowland to Bugh on January 6, 2012, requires that the charge against him be dismissed or the case be remanded for a new trial. We review de novo the denial of a motion to dismiss an indictment based on the destruction of evidence. United States v. Webster, 625 F.3d 439, 446 (8th Cir. 2010).

It is well established that the Government may not in good or bad faith suppress evidence favorable to the accused. Brady v. Maryland, 373 U.S. 83, 87 (1963). "If, however, the evidence in question is only potentially useful, as opposed to clearly exculpatory, then a criminal defendant must prove bad faith on the part of

the police to make out a due process violation." United States v. Houston, 548 F.3d 1151, 1155 (8th Cir. 2008) (citing Arizona v. Youngblood, 488 U.S. 51, 57 (1988)). The burden is on the defendant to demonstrate the evidence was destroyed in bad faith, Webster, 625 F.3d at 447, and negligent destruction of evidence is insufficient to establish a due process claim, Houston, 548 F.3d at 1155. Additionally, this Court will defer to a district court's factual findings regarding destruction of evidence. United States v. Clark, 980 F.2d 1143, 1147 (8th Cir. 1992) (per curiam).

Bugh argues that Officer Nelson acted in bad faith by erasing recordings from January 6, 2011, the day Nowland began working as a confidential informant and first called Bugh. Officer Nelson testified that Nowland's first call made to Bugh on January 6, 2011, was no longer on his digital recorder. According to Officer Nelson, he accidentally erased it, stating: "I was actually surprised when I went to download all the calls that those calls weren't on the recorder, but they just weren't."

Even if the recordings were potentially useful to Bugh,[6] he presented no evidence that Officer Nelson acted in bad faith or that the recordings were potentially exculpatory. The district court made an extensive record on this issue and found that Officer Nelson was credible and did not intend to erase the recordings.[7] Based on our review of the record, the district court's factual findings, and the lack of any evidence supporting Bugh's allegations, erasing the tapes was at worst negligent and, therefore, insufficient to establish a due process violation. See Houston, 548 F.3d at 1155. As

---

[6]Bugh contends the erased recordings would have supported his entrapment defense, but based on the overwhelming amount of evidence that was presented to the jury on this issue, nothing supports his allegation that the erased recordings contained exculpatory material, much less clearly exculpatory material.

[7]The district court determined that: "Based on Officer Nelson's demeanor and the content of his testimony, the Court finds Officer Nelson's testimony that he did not remember erasing the January 6th recordings—and that, in fact, he was 'surprised' to learn that the recordings had been erased—is credible."

a result, we affirm the district court's holding that the erased tapes did not constitute a due process violation.

## D.

Finally, Bugh argues that non-residential burglaries should not be considered crimes of violence for purposes of the Armed Career Criminal Act. Bugh recognizes this position contravenes our prior cases and only raises it to preserve the issue. We review the district court's determination de novo. United States v. Willoughby, 653 F.3d 738, 741 (8th Cir. 2011). This Court has repeatedly held that "burglary" within the meaning of the Armed Career Criminal Act includes commercial and residential burglaries. United States v. Constantine, 674 F.3d 985, 990 (8th Cir. 2012). Therefore, we affirm the district court's determination that Bugh's convictions constituted violent felonies under the Armed Career Criminal Act.

## III.

For the above reasons, we affirm Roger Bugh's conviction and sentence.

_____