# United States Court of Appeals
## For the Eighth Circuit

_____

No. 12-3816
No. 13-1021

_____

United States of America

*Plaintiff - Appellee*

v.

Lorenzo Harris-Thompson

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Northern District of Iowa - Cedar Rapids

_____

Submitted: December 19, 2013
Filed: May 2, 2014

_____

Before RILEY, Chief Judge, WOLLMAN and LOKEN, Circuit Judges.

_____

LOKEN, Circuit Judge.

While he awaited sentencing after pleading guilty to being an unlawful drug user in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(3) and 924(a)(2), Lorenzo Harris-Thompson arranged for his girlfriend to pay an undercover police officer to kill the police chief of Mount Vernon, Iowa, because he believed that officer would testify at the upcoming sentencing hearing. New charges were filed, and a jury

convicted Harris-Thompson of attempted obstruction of justice, attempted murder of a witness, and use of a telephone in the commission of murder for hire, violations of 18 U.S.C. §§ 1503, 1512(a)(1)(A), and 1958. The district court[1] imposed four consecutive sentences totaling 840 months in prison. Harris-Thompson appeals his three convictions in the murder-for-hire case; denial of a belated motion to withdraw his guilty plea in the user-in-possession case; and both sentences. We affirm.

## I. Jury Bias Issues

Consistent with defense counsel's focus at oral argument, we begin with the most unusual issue the district court encountered in trying the murder-for-hire case -- whether Harris-Thompson was entitled to a mistrial or a new trial when the jurors reported that "words were exchanged" with members of "Mr. Harris-Thompson's family" as jurors left the courthouse after the first day of their deliberations. The district court, advised of this report the next morning, promptly stated to Harris-Thompson and both attorneys, on the record:

> This obviously is a very, very serious matter and could result in criminal charges being filed against members of Mr. Harris-Thompson's family for attempting to influence the jury.
>
> I have asked . . . a Deputy United States Marshal to interview the jurors this morning, find out who contacted them, which family members, what was said. And then it will be obviously up to someone else to decide whether criminal charges should be filed.
>
> I have no idea what was said . . . no one else has asked [the jurors] what was said. . . . They do not wish to, at this point, talk to the Court about it.

---

[1]The Honorable Linda R. Reade, Chief Judge of the United States District Court for the Northern District of Iowa.

> So I just wanted to make you aware of that. We may have a mistrial situation. We may have another criminal case.

The court further explained that, after the marshal reports,

> the decision will have to be made: Is this a jury that has been so interfered with that they cannot [continue or] is this something that won't affect them and they can go on?
>
> I guess we could talk about whether or not you want to bring them in and ask them . . . if they're able to proceed and try to reach a verdict. I could go in and talk to them. We could all be here when they come in.

Defense counsel responded, "It seems to me the best thing we can do is get as much information as we can get . . . before we decide what we're going to do in terms of the jury." Counsel did not object to the marshal talking with the jurors. "Obviously," the court noted, "he's not talking about the substance of this case, but determining if we have another criminal case."

After the marshal advised that he was finished interviewing the jury, counsel and the court held an off-the-record discussion in chambers. Back on the record, defense counsel noted, and the court confirmed, that another family had been in the courthouse the previous afternoon for an unrelated sentencing. Counsel reported that he had contacted Harris-Thompson's family members, who told him they were not present when the jury left the courthouse that evening, suggesting it was the other family the jury encountered in the parking lot. The court related the results of the marshal's meeting with the jurors: no words were exchanged between the jurors and the family in question, but the jurors felt uncomfortable leaving the courthouse at the same time as family members and being in the parking lot together, and one juror had worried that somebody was following her home on the interstate until that car turned in a different direction. The court then stated the issue to be decided:

-3-

> are the jurors able to fairly evaluate the evidence, the arguments, follow the instructions on the law, and deliberate to verdict; or . . . have they been influenced to the extent where they cannot put aside their feelings last night as they left [with] the family, and then mingled with them in the parking lot?
>
> The suggestion has been made that I talk to the jury, just me and [the marshal], and allay their fears, explaining . . . that there naturally would be some interaction between jurors and members of the public, including people who are here watching trials . . . and then asking them, has this so influenced them that they feel they cannot put it aside and just concentrate on the evidence, the instructions on the law, and reach a verdict.

Defense counsel responded: "we did discuss [this course of action, presumably in chambers]; I think it's acceptable. . . . I think this is the best procedure we've got . . . we trust the Court and [the marshal]." Counsel requested that the court "explain to [the jury that] they may have seen an unhappy African-American family from the other [sentencing]." The court agreed to do so, and left to speak with the jury.

After meeting with the jury, the court reported, again on the record, that it had "explained everything that [the parties] suggested," including that the people the jury saw in the parking lot may have been part of a different family that attended an unrelated sentencing. The jurors said they had noticed Harris-Thompson taking notes during the trial; the court explained to them "that a defendant is expected to participate in the trial in every way, help his lawyer, send notes to his lawyer reminding the lawyer of things." The court also told the jury, "nobody has addresses for them except the lawyers, and nobody even knows what hometown they're from." After this discussion, the court reported that the jurors

> all said that there's no problem. They could disregard anything that happened last night, focus on the job at hand, which is to make decisions in the case we just tried. No one said they were unable to do that, and I

kind of probed it a couple different ways, and they're fine. . . . [I]t was just a very positive meeting, in my opinion.

After conferring with Harris-Thompson, defense counsel moved for a mistrial, arguing that "a fear's been created by the situation at the courthouse" and "a scared jury is not going to be a fair jury." Counsel did not object to the court's procedural handling of the situation or request a further hearing of any kind. The court denied the motion for a mistrial and a subsequent motion for a new trial on this ground: "It is the Court's opinion, based on conversations with the jurors . . . that any concerns that they have have been alleviated." In a supplemental *pro se* motion for a new trial, Harris-Thompson argued for the first time that the district court's "unrecorded contact with the jury during deliberations" violated his Fifth and Sixth Amendment rights. The district court denied this motion without a hearing.

On appeal, new counsel for Harris-Thompson challenges every action taken by the district court in dealing with this unique situation, including actions specifically endorsed by Harris-Thompson's experienced trial counsel. We will explore these issues by defining what the court was required to do to ensure Harris-Thompson a fair trial, and then determining whether the court satisfied those requirements.

The Sixth Amendment right to trial by an impartial jury means trial by a jury that is not tainted or influenced by third-party communication, contact, or tampering. Thus, when a district court has reason to believe a jury may have been improperly influenced, it "should determine the circumstances, the impact [of the improper contact] upon the juror[s], and whether or not it was prejudicial, in a hearing with all interested parties permitted to participate." United States v. Behler, 14 F.3d 1264, 1268 (8th Cir.), cert. denied, 513 U.S. 960 (1994), quoting Remmer v. United States, 347 U.S. 227, 230 (1954). "We defer to a district court's discretion in deciding how to handle allegations of intrusions on the jury." United States v. Tucker, 137 F.3d 1016, 1030 (8th Cir. 1998). "[T]he depth of investigation required depends on both

the gravity of the alleged misconduct and the substantiality of the . . . showing of misconduct." Id. at 1031.

Here, the district court immediately recognized the issues raised by the jurors' expression of concern and involved counsel, with Harris-Thompson present, in determining how to investigate alleged misconduct. Counsel and the court agreed that the court should interview the jurors with only the marshal present and report the results of the court's interview on the record -- the same procedure defense counsel requested and the district court adopted in Behler, except that in this case the court's interview with the jury was not transcribed. See 14 F.3d at 1267-68. Without question, the court understood the inquiry that Remmer and other cases required and attempted to fashion a procedure that would ensure either completion of the trial by a fair and impartial jury, or grant of a mistrial.

Harris-Thompson nonetheless argues that the district court's procedural handling of this issue "constituted a serious breach of numerous rights." First, he contends, "[t]here were two separate episodes of ex parte contact with the jury by court personnel without [Harris-Thompson's] presence" that violated his Sixth Amendment Confrontation Clause right, and his right to be present at "every trial stage," Fed. R. Crim. P. 43(a)(2). This contention is without merit. Harris-Thompson had no right to be present during the initial contact between the deputy marshal and the jurors because this was the investigation of a possible new crime. Harris-Thompson waived any right to be present while the district court subsequently interviewed the jurors; defense counsel, in Harris-Thompson's presence, agreed to proceeding in this manner, describing it as "the best procedure we've got." See United States v. Gagnon, 470 U.S. 522, 529 (1985) (failure to invoke the Rule 43 right to be present "constitutes a valid waiver of that right"); Behler, 14 F.3d at 1268; United States v. Brown, 923 F.2d 109, 112 (8th Cir.), cert. denied, 502 U.S. 833 (1991). An explicit personal waiver by Harris-Thompson was not required. Moreover, a defendant has the right to be present at an ex parte conversation between

the trial judge and jurors only when his presence is "required to ensure fundamental fairness or a reasonably substantial opportunity to defend against the charge." Brown, 923 F.2d at 112, quoting Gagnon, 470 U.S. at 527. Here, as in Brown, Harris-Thompson "would have added nothing nor gained anything by attending [the district court's interview], and [his] presence could have been detrimental." Id.

Harris-Thompson next argues that the district court failed to make an adequate record of its meeting with the jurors. In support, he notes that it "appears from the limited record made" that the court went "far beyond" the jurors' alleged contact with members of the family in the parking lot by exploring Harris-Thompson's note taking at trial and whether he had their home addresses. A trial judge should avoid ex parte communications with a jury, particularly during its deliberations, but "ex parte hearings have been upheld where the circumstances warrant and fundamental fairness is not sacrificed." Behler, 14 F.3d at 1268. Here, the timing of the possible improper third-party contact gave the court no choice but to investigate after deliberations began. The parties then agreed that an ex parte interview was the best way to proceed; the court gave the parties an immediate full report of its interview, on the record; neither defense counsel nor Harris-Thompson requested an additional inquiry of the jurors with the parties present; and the additional questions raised by the jury and addressed by the district court related to their initial personal security concerns.[2] In these circumstances, there was no procedural plain error.

This brings us to what should be the main contention on appeal, whether the district court erred in denying Harris-Thompson's timely motion for a mistrial after the court reported the results of its juror interview. "We give substantial weight to the trial court's appraisal of the prejudicial effects of extraneous information on the jury,

---

[2]We cannot ignore that Harris-Thompson was on trial for attempting to kill a prospective witness in the earlier criminal case. This did not affect his right to trial by a fair and impartial jury, but it may explain why jurors were particularly concerned about their personal security.

since the trial judge has the advantages of close observation of the jurors and intimate familiarity with the issues at trial." United States v. Cheyenne, 855 F.2d 566, 568 (8th Cir. 1988). Here, the court promptly investigated the parking lot incident, with the help of defense counsel's independent inquiry. The court determined there had been no impermissible contacts between the jurors and Harris-Thompson's family, and so advised the jury. It questioned the jurors and received assurances that the parking lot incident would not affect their duty to remain impartial. Carefully weighing the gravity of the alleged misconduct and the likelihood that it had occurred, the court concluded the jurors' concerns had been alleviated and would not prejudice their ability to render an unbiased decision. Affording the court's appraisal the deference it deserves, we find nothing in the record that would undermine its ruling.

For the first time on appeal, Harris-Thompson argues the district court erred in denying his motion for a mistrial without a further hearing. "A district court is not obligated to conduct an evidentiary hearing each time there is a possibility of juror bias." United States v. White Bull, 646 F.3d 1082, 1095 (8th Cir. 2011). Here, the court conducted the investigation that Remmer required. Defense counsel agreed to the procedure used and requested no further hearing when the mistrial motion was made. There was no plain error in not holding a further hearing.

Finally, Harris-Thompson argues that the district court "compounded" its other errors by failing to poll the jurors individually when they returned a guilty verdict. The court polled the jurors by asking those who voted guilty to raise their hands; each juror raised his or her hand. When defense counsel asked for a poll, the court responded, "I have done that." Counsel replied, "Okay . . . nothing further." On appeal, citing cases from other circuits, Harris-Thompson argues that the proper way to poll a jury is to ask each juror individually. "[I]t is well settled that a poll under [Criminal] Rule 31(d) is not required unless requested and is waived if the request is not timely." United States v. Hiland, 909 F.2d 1114, 1138-39 (8th Cir. 1990). This issue was waived.

## II. Sufficiency of the Evidence

Harris-Thompson argues there was insufficient evidence supporting his convictions for attempted obstruction of justice, attempted murder of a witness, and use of a telephone in the commission of murder for hire. "We review the sufficiency of the evidence *de novo*, viewing evidence in the light most favorable to the jury's verdict, resolving conflicts in the government's favor, and accepting all reasonable inferences that support the verdict." United States v. Dunn, 723 F.3d 919, 924 (8th Cir. 2013), cert. denied, 134 S. Ct. 945 (2014).

Following Mount Vernon police chief Mark Winder's investigation of neighbors' complaints, a warrant search of Harris-Thompson's home uncovered cash, marijuana, drug paraphernalia, and two rifles. Harris-Thompson, his girlfriend Melissa Johnson, and three other residents were charged with user-in-possession offenses. Harris-Thompson pleaded guilty and was incarcerated pending sentencing. Several inmates testified at the murder-for-hire trial that Harris-Thompson complained his arrest was racially motivated and said he wanted to harm the Mount Vernon police chief. In recorded phone calls from jail, Harris-Thompson asked Johnson to "find out in as low-key manner as possible" the name of the Mount Vernon police chief, expressing concern he would testify against Harris-Thompson at sentencing. Johnson later told Harris-Thompson the chief was Mark Winder.

Harris-Thompson's cellmate, Bruce Troyer, testified that, as Harris-Thompson's sentencing approached, he asked if Troyer knew someone who could murder the police chief. Troyer told Harris-Thompson he knew someone who would do it for $5,000, a (fictional) friend named "Fat Tony" Genovese from Chicago. Troyer then reported Harris-Thompson's scheme to the head jailer, and law enforcement arranged for an undercover officer to pose as Fat Tony, using a Chicago cell phone number. Troyer gave Fat Tony's number to Harris-Thompson and a message that he would need to make a $500 down payment. Troyer testified that

Harris-Thompson immediately called his girlfriend (Melissa Johnson) to see how much money she had and to give her "Tone's" phone number. Several recorded follow-up calls revealed Harris-Thompson's plan to have Johnson deliver the money to Fat Tony at a gas station and identify herself with the code words "silence the critics." When Johnson expressed discomfort with "not knowing what's going on," Harris-Thompson told her the money was for Christmas presents.

Officer Michael Smithey pretended to be Fat Tony. He testified that Johnson arrived at the meeting place, identified herself by the phrase "silence the critics," and delivered $450 in cash the night before Johnson's sentencing in the user-in-possession case. Johnson corroborated the details of this meeting. Harris-Thompson called Johnson to confirm the meeting had taken place. Troyer testified that the next morning, Harris-Thompson was concerned because Johnson's sentencing had been rescheduled. The two of them called Fat Tony together. During this recorded call, Fat Tony (Smithey) said, "The shit is done," and he needed to be paid so he could "get the fuck out of here." When Harris-Thompson said, "I can meet you Sunday with it," Fat Tony said, "I need the shit now!" After this call, Troyer testified, Harris-Thompson "did a little dance after he realized that the chief . . . was dead." In further recorded calls, Harris-Thompson told Johnson to forget "everything that happened yesterday," and to "grab that $2,500 and something else and do what you did for me yesterday," explaining the money was for "getting fur coats for everybody."

Harris-Thompson testified at trial. His defense was that Troyer, hoping for a reduced sentence, led Harris-Thompson to believe that Tony would buy fur coats for Christmas presents while telling the police that Harris-Thompson was hiring a hit man. He asked Johnson to find out Chief Winder's name because he planned to file a civil suit against the police, with Troyer's help. He explained that "Success Silences the Critics" was the name of a business he and Troyer were planning to start and said that he was "in shock" at Fat Tony's statements during their phone call. Other witnesses confirmed that Troyer and Harris-Thompson spent a lot of time together at

the jail, that Troyer did most of the talking, and that they discussed business plans. Harris-Thompson denied telling other inmates he wanted to kill the police chief.

Harris-Thompson argues the district court erred in denying his motion for judgment of acquittal, and his alternative motion for a new trial, because the only evidence that "arguably proved" the elements of the three offenses was the testimony of Troyer, an unreliable jailhouse informant, and because "[t]he facts of the government's case simply do not add up." This contention is contrary to many controlling decisions. "We have repeatedly upheld jury verdicts based solely on the testimony of co-conspirators and cooperating witnesses, noting that it is within the province of the jury to make credibility assessments and resolve conflicting testimony." Dunn, 723 F.3d at 925 (quotation omitted).

We conclude the evidence was more than sufficient to support the jury's verdict of guilty of all three charged offenses. The recorded phone calls from Harris-Thompson to Johnson and the testimony of Troyer, Smithey, and Johnson permitted the jury to find beyond a reasonable doubt that Harris-Thompson directed Johnson to pay Fat Tony to kill Chief Winder because he had gathered evidence of Harris-Thompson' drug offense and was likely to testify at his sentencing. This was sufficient to convict Harris-Thompson of "corruptly or by . . . force" obstructing or impeding "the due administration of justice," 18 U.S.C. § 1503; of "attempt[ing] to kill another person, with intent to prevent the attendance or testimony of any person in an official proceeding," 18 U.S.C. § 1512(a)(1)(A); and of using a "facility of interstate or foreign commerce," namely, a telephone, "with intent that a murder be committed . . . as consideration for a promise or agreement to pay, anything of pecuniary value," 18 U.S.C. § 1958.

The district court did not abuse its discretion in denying Harris-Thompson's alternate motion for a new trial. "Motions for new trials based on the weight of the evidence generally are disfavored . . . . A district court may grant a new trial for

insufficiency of the evidence only if the evidence weighs heavily enough against the verdict that a miscarriage of justice may have occurred." United States v. Vore, 743 F.3d 1175, 1181 (8th Cir. 2014) (quotations omitted). After careful review of the record, we conclude the district court did not abuse its discretion in denying Harris-Thompson's motion for a new trial. That the jury did not believe Harris-Thompson's testimony caused no miscarriage of justice in this case.[3]

### III. Evidentiary Issues

Harris-Thompson argues the district court abused its discretion by excluding several documents and recordings he offered to discredit Troyer's testimony and to support his defense that he was set up by the domineering and manipulative Troyer. "We review the evidentiary rulings of a district court only for abuses of discretion, and will reverse only when an improper evidentiary ruling affects the substantial rights of the defendant or when we believe that the error has had more than a slight influence on the verdict." United States v. Yarrington, 634 F.3d 440, 447 (8th Cir. 2011) (quotation omitted). The rulings in question arose at three distinct points in the trial.

First, during defense counsel's extensive cross examination, Troyer admitted that while they were in jail, he helped Harris-Thompson write letters to his attorneys, helped review the Presentence Investigation Report (PSR) for Harris-Thompson's upcoming sentencing, discussed business plans, and offered to help Harris-

---

[3]The district court did not abuse its discretion in denying without a hearing Harris-Thompson's separate *pro se* motion for a new trial. "The district court has wide discretion in this type of post trial motion and it need only grant an evidentiary hearing in exceptional circumstances." United States v. Preciado, 336 F.3d 739, 747 (8th Cir. 2003), cert. denied, 540 U.S. 1134 (2004). The court's order noted that the allegedly newly-discovered evidence "is merely cumulative or impeaching" and "if it is newly discovered . . . does not weaken the government's case."

Thompson's family fix credit report problems. Defense counsel offered into evidence two attorney letters, notes Troyer wrote about the PSR, and two documents containing handwritten notes relating to business plans. When the government objected, the district court reserved ruling until the jury retired that evening.

After the jury retired, in response to the government's hearsay objection, defense counsel stated that the documents were not offered to prove the truth of their contents, but as non-hearsay "verbal acts." The district court asked, "what [is] the relevance?" Defense counsel answered, "the relevance is to show the intimacy which [Troyer] had and the complete trust in which the defendant obviously held him . . . . [T]he intimacy and trust involved in their [relationship] . . . is crucial to the theory of defense." After a lengthy discussion of hearsay, relevance, and foundation issues, the court advised it would "give you my answer in the morning."

At the start of trial the following morning, the court excluded the documents at issue on appeal. Citing Rule 403 of the Federal Rules of Evidence, the court explained that, to the extent the documents were not offered as hearsay and proper foundation was established by Troyer's testimony, Troyer's relationship with Harris-Thompson had already been established and therefore "any limited relevance is overshadowed by the danger of confusion of the issues, misleading the jury, wasting time, and needless presentation of cumulative evidence." When counsel objected that "the defendant is entitled to put on his theory of defense," the court responded:

> [A]ll of the evidence that you want to get in on your theory of defense -- that Mr. Troyer established a relationship with the defendant by writing letters, offering to fly the family, setting up corporations -- all of that's in evidence. The only thing that's not in evidence are these documents which are cumulative and attempt to introduce a number of subplots that do not aid the jury and are not relevant to the decisions that they have to make. So you got in what you wanted to in terms of . . . Mr. Troyer allegedly ingratiating himself to the defendant.

-13-

After careful review of the record, we agree with these rulings. There was no abuse of the court's substantial evidentiary discretion.

Second, prior to Harris-Thompson testifying as the last defense witness, defense counsel offered two recordings that the government had produced in discovery: (i) a 45-minute video recording of Troyer's conversation with jailers reporting that Harris-Thompson was planning to hire a hit man; and (ii) a recorded phone call from Troyer in jail to a local television station.

(i) The government objected to the 45-minute video recording as "simply cumulative" to Troyer's trial testimony. Defense counsel argued that this evidence was admissible to show Troyer's "capacity for deception," the effect of his statements on law enforcement, "to provide context," and for inconsistencies with Troyer's trial testimony. The district court excluded the video because it was hearsay without a valid exception, any prior inconsistent statements had not been properly used to impeach government witnesses, and the effect of Troyer's statements on law enforcement was irrelevant. Harris-Thompson argues this ruling was "devastating" to the defense's attempt to show Troyer's planning and motivation for the set up and his ability to deceive. We conclude the district court did not abuse its discretion when it excluded as cumulative a lengthy video. Harris-Thompson made no effort to identify and segregate statements that would be offered for relevant, non-hearsay purposes. He introduced ample other evidence of Troyer's motives, lack of truthfulness, and conduct the defense portrayed as manipulative and deceptive. "The District Court retains considerable latitude even with admittedly relevant evidence in rejecting that which is cumulative, and in requiring that which is to be brought to the jury's attention to be done so in a manner least likely to confuse that body." Hamling v. United States, 418 U.S. 87, 127 (1974).

(ii) During cross-examination, Troyer was asked if he had "pretend[ed] to be an officer from Iowa County and call[ed] the media about this case." Troyer

answered, "I did not." In the recorded phone call, Troyer falsely told a television station representative, "I work at Iowa County." The district court sustained the government's objection that the phone call was "a specific instance of conduct" and therefore not admissible to impeach Troyer's truthfulness under Rule 608(b) of the Federal Rules of Evidence. On appeal, Harris-Thompson argues the phone call was admissible under Rule 613(b) as extrinsic evidence of a prior inconsistent statement. This contention was not preserved in the district court and is without merit. See United States v. Cowling, 648 F.3d 690, 697 (8th Cir. 2011), cert. denied, 132 S. Ct. 1905 (2012).

Third, during Harris-Thompson's direct examination, he identified and defense counsel offered into evidence two handwritten documents purporting to be plans for a business to be called "Success Silences the Critics, LLC." The government objected and the district court deferred ruling until the next trial recess. The court ruled that the longer document was an out-of-court statement by the defendant offered for the truth of the matter asserted, asked defense counsel if a hearsay exception applied, and excluded the document as hearsay when no exception was urged. There was no abuse of discretion, as the hearsay exceptions argued on appeal are unpersuasive and were not preserved in the district court. The court did not explicitly rule on the second document. As defense counsel did not press for a ruling, that issue was waived. See United States v. Morales, 684 F.3d 749, 755 (8th Cir. 2012).

## IV. Jury Instruction Issues

Harris-Thompson argues the district court abused its discretion when it rejected his proposed theory-of-defense instruction and two proposed mistake-of-fact instructions. We disagree. Even when a theory-of-defense instruction is timely requested, correctly states the law, and is supported by the evidence, "defendant is not entitled to a particularly worded instruction, or to a judicial narrative of his version of the facts." United States v. Christy, 647 F.3d 768, 770 (8th Cir. 2011) (quotations and

citation omitted).  Harris-Thompson's proposed theory of defense instruction was a narrative of his version of the facts -- that Troyer "proposed a sting operation," "deceived law enforcement," and tricked Harris-Thompson into believing he was buying fur coats.  The proposed mistake of fact instructions related to Harris-Thompson's intent when arranging for Johnson to pay money to Fat Tony.  The court's final instructions required the government to prove Harris-Thompson's intent for each count charged, enabling Harris-Thompson to argue that he did not have the intent necessary for conviction.  Thus, the "instructions as a whole, by adequately setting forth the law, afford[ed] counsel an opportunity to argue the defense theory and reasonably ensure[d] that the jury appropriately consider[ed] it." Id.

## V. Denial of Plea Withdrawal Motion

Fourteen months after the court accepted his guilty plea to the user-in-possession charge, Harris-Thompson moved to withdraw the plea, attaching a statement of facts in support but not requesting an evidentiary hearing.  The district court denied the motion.  On appeal, Harris-Thompson argues it was plain error to deny the motion without a hearing because his allegations of actual innocence, and that he was under the influence of drugs and alcohol and coerced by the prosecutor when he pleaded guilty, were fair and just reasons to withdraw the plea.  "The trial court can deny a motion to withdraw a guilty plea without holding an evidentiary hearing if the allegations in the motion are inherently unreliable, are not supported by specific facts or are not grounds for withdrawal even if true." United States v. Alvarado, 615 F.3d 916, 920 (8th Cir. 2010) (quotation omitted).  Here, Harris-Thompson's allegations were inherently unreliable because they contradicted his statements at the time of arrest, at the proffer interview, in the plea agreement, and at the change of plea hearing.  There was no abuse of discretion, much less plain error.

## VI. Reasonableness of the Sentence

After a combined sentencing hearing, the district court imposed statutory maximum sentences for each of Harris-Thompson's four crimes of conviction -- 120 months for the drug-user-in-possession offense, 240 months for attempted obstruction of justice, 360 months for attempted murder of a witness, and 120 months for use of a telephone in committing a murder for hire. The advisory guidelines range was 51-63 months for the user-in possession offense and life in prison for the other three offenses. Citing U.S.S.G. § 5G1.2(d) and stating that the court had "considered the statutory provisions . . . [including] the nature and circumstances of the offense and the history and characteristics of the defendant," the court ruled that the four sentences should be served consecutively. Harris-Thompson argues the district court abused its discretion "by focusing exclusively on the nature of the offense, to the exclusion of his individual history and characteristics," in imposing what was effectively a life sentence.

Mitigating circumstances in Harris-Thompson's personal history were presented in the PSR and in his sentencing memorandum. The district court specifically stated that it had considered Harris-Thompson's "history and characteristics," and we presume that it did. United States v. Wisecarver, 644 F.3d 764, 774 (8th Cir.), cert. denied, 132 S. Ct. 533 (2011). The court described Harris-Thompson's murder-for-hire scheme as "the most extreme obstruction of justice that I have seen while on the bench." Given the court's "wide latitude to weigh the § 3553(a) factors in each case and assign some factors greater weight than others in determining an appropriate sentence," United States v. Bridges, 569 F.3d 374, 379 (8th Cir. 2009), it was not an abuse of discretion to impose consecutive maximum sentences. Though the resulting sentence is unquestionably long, we cannot conclude that it is substantively unreasonable.

The judgments of the district court are affirmed.

_____