# United States Court of Appeals
## For the Eighth Circuit

_____

No. 24-2077

_____

United States of America

*Plaintiff - Appellee*

v.

Anthony Ward

*Defendant - Appellant*

_____

Appeal from United States District Court
for the District of South Dakota - Western

_____

Submitted: February 14, 2025
Filed: June 11, 2025

_____

Before SMITH, KELLY, and KOBES, Circuit Judges.

_____

KELLY, Circuit Judge.

A jury convicted Anthony Ward of distribution of a controlled substance resulting in serious bodily injury and conspiracy to distribute fentanyl. Ward appeals, and we affirm.

I.

On March 15, 2022, law enforcement responded to the scene of an apparent drug overdose in Rapid City, South Dakota. The officers arrived at a home, where they found a man named K.S. "alert" and "conscious," though "a little sluggish." Prior to the officers' arrival, K.S. had received a dose of Narcan and had "started to wake up." Paramedics checked K.S.'s vital signs and recommended that he see a physician, but K.S. refused further treatment and did not go to the hospital.

In the course of an investigation, officers came to suspect two people of being involved in distributing the fentanyl to K.S.: a man, and a woman with purple hair named M.B. A source told officers that the two suspects were staying at a Rapid City Hampton Inn. Officers surveilled the hotel and confirmed that two adults matching these descriptions were staying there and had been seen driving a red Ford Fiesta. With this information, a team of officers made "an ops plan" to stop and search the car. Pursuant to the plan, on March 23, 2022, law enforcement saw the Fiesta enter the hotel's parking lot; a woman with purple hair was driving, and another woman was in the passenger seat. A man exited the hotel carrying two bags, which he put in the Fiesta's trunk before getting into the backseat on the passenger side. South Dakota Highway Patrol Trooper Tyler Jackson had been instructed to "form [his] own probable cause" before stopping the vehicle, and this happened quickly: Jackson observed the car run a stop sign soon after leaving the parking lot.

Jackson initiated the stop. The driver, who provided identification, was a woman named B.B.; despite the purple hair, she was not the person officers had expected. South Dakota Highway Patrol Trooper Chad Gamber arrived on the scene and, while Jackson completed stop-related tasks with B.B., Gamber took to "identifying [the other] passengers and talking to them." Gamber testified that he asked the man in the backseat whether he had identification; the man told Gamber that he did not. Gamber then asked the man his name, and a back-and-forth ensued over the course of several minutes in which the man repeatedly provided slightly varied versions of a name, none of which appeared in the database Gamber

consulted. When the man finally provided a name that matched an entry in the database, the photograph did not resemble him.[1]

The backseat passenger turned out to be Ward, whom the officers arrested for false impersonation about 25 minutes into the stop.[2] While searching Ward's person incident to arrest, Gamber found marijuana, "several cell phones," and "some keys." The officers then searched the vehicle and found methamphetamine in the center console, snort straws in the glove box, and the two bags Ward had put in the trunk. In one of those bags, officers found blue fentanyl pills, a stolen gun, marijuana, over thirty 10-milligram doses of Suboxone, $2,859 in cash,[3] and an "unknown capsule." In the other, they found some men's clothing and testosterone pills.

Ward was charged with distribution of a controlled substance resulting in serious bodily injury under 21 U.S.C. § 841(a)(1), (b)(1)(C), and 18 U.S.C. § 2, and conspiracy to distribute fentanyl under 21 U.S.C. §§ 841(a)(1), (b)(1)(A), and 846. Ward moved to suppress evidence from the traffic stop, and after a hearing, the district court[4] denied the motion. Ward also moved to dismiss his indictment, arguing that officers failed to preserve evidence collected during the traffic stop,

---

[1]The photograph showed a man with a birthmark on the left part of his forehead. The car passenger kept his face covered with a do-rag through much of the encounter with Gamber, and when Gamber asked him to show his face, the man "used his left hand to pull [it] off . . . and, like, cover his forehead." When Gamber got a clear look, he realized the two men were not the same.

[2]Officers ultimately identified Ward through his fingerprints.

[3]Before Gamber searched the car, Ward asked him about retrieving some money that he had locked in a bag in the trunk and that could only be obtained using a key that he had. The officers found the key on Ward and used it to open a safe inside the bag, where they found both money and Suboxone. Ward claimed only the money belonged to him.

[4]The Honorable Karen E. Schreier, United States District Judge for the District of South Dakota.

which the district court also denied. After a five-day trial, the jury convicted Ward on both counts, and the court imposed concurrent 360-month sentences.

Ward appeals.

## II.

First, Ward challenges the district court's denials of his motions to suppress and to dismiss the indictment. We address each in turn.

## A.

In assessing the denial of a motion to suppress, we review the district court's factual findings for clear error and its legal conclusions de novo. United States v. Long, 797 F.3d 558, 564 (8th Cir. 2015). "We may affirm . . . on any ground that the record supports." United States v. Soderman, 983 F.3d 369, 374 (8th Cir. 2020).

Ward does not contest the lawfulness of the initial stop. Nor does he challenge the search of the car. See United States v. Russell, 847 F.3d 616, 618 (8th Cir. 2017) ("Generally, a mere passenger does not have standing to challenge a vehicle search where he has neither a property nor a possessory interest in the automobile." (internal quotation marks omitted)). Rather, Ward argues that officers unconstitutionally extended the stop before the search by asking him both for his identification and that he sit in the patrol car while they sought to confirm his identity. See United States v. Green, 275 F.3d 694, 699 (8th Cir. 2001) (noting that a passenger in a stopped vehicle "may . . . contest the lawfulness of his own detention [during a traffic stop] and seek to suppress evidence as the fruit of his illegal detention").

We conclude that the officers did not extend the stop unreasonably. During a "traffic stop, an officer may complete routine tasks, which may include asking a passenger for identification and running a computer check if the passenger consents to the request for identification." United States v. Cloud, 594 F.3d 1042, 1044 (8th

-4-

Cir. 2010); see also United States v. Roberts, 687 F.3d 1096, 1098–1100 (8th Cir. 2012) (affirming denial of suppression motion where officer, before completing stop-related tasks with the driver, asked the passengers for identification and found that one had an outstanding warrant). And "a lawful detention may be prolonged for a reasonable time without violating the Fourth Amendment if complications arise while checking identification." Cloud, 594 F.3d at 1045.

Ward consented to provide his name to Gamber soon after the traffic stop began,[5] and there is no indication that Gamber unreasonably extended the stop while he tried to confirm Ward's identity. Rather, complications arose because Ward provided fake names. Ward first claimed his name was "Kevin," but he was "hesitant" to provide his last name. Accordingly, Gamber turned to the woman in the front passenger seat, who gave her name. Gamber then asked Ward for his name a second time, and Ward said "Kevin Rodney Wolffork." But this name did not match any in the database Gamber consulted. Gamber asked Ward to confirm his name, and Ward provided a different spelling, which also was not in the database. Gamber asked Ward to join him in the patrol car "so [Gamber] could show him [his] computer" to make sure the spelling was correct. When Gamber showed Ward the name spelled out on his computer, Ward claimed Gamber "had the names flipped around," and provided a different name that ultimately hit a match to a person other than Ward.

Given the complications Gamber faced in identifying Ward, and concomitant suspicion that Ward was providing false identification, there was neither unreasonable delay nor an unreasonable expansion of the stop before Ward's arrest.

_____

[5]Ward suggests that he did not agree to provide identification and sit in the patrol car. But the district court did not clearly err in finding otherwise. Gamber testified that though Ward was "hesitant" to provide a name and join him in the patrol car, he did not refuse either request. Nor was it unreasonable for Gamber to ask Ward to join him in the patrol car to help enter an accurate name into the database. Cf. Maryland v. Wilson, 519 U.S. 408, 415 (1997) ("[A]n officer making a traffic stop may order passengers to get out of the car pending completion of the stop.").

See United States v. Chavez Loya, 528 F.3d 546, 553 (8th Cir. 2008) ("An officer may . . . prolong the detention if the driver's responses and the circumstances give rise to a reasonable suspicion that criminal activity unrelated to the stop is afoot.").[6] The district court did not err in denying Ward's motion to suppress.

B.

Next, Ward challenges the denial of his motion to dismiss for destruction of evidence. "It is well established that the Government may not in good or bad faith suppress evidence favorable to the accused." United States v. Bugh, 701 F.3d 888, 894 (8th Cir. 2012) (citing Brady v. Maryland, 373 U.S. 83, 87 (1963)). However, if "the evidence in question is only potentially useful, as opposed to clearly exculpatory, then a criminal defendant must prove bad faith on the part of the police to make out a due process violation." Id. (quoting United States v. Houston, 548 F.3d 1151, 1155 (8th Cir. 2008)). Our review is de novo, but we "will defer to a district court's factual findings regarding destruction of evidence." Id. at 894–95.

Ward claims that officers took five cell phones from him during the traffic stop that were never entered into evidence. According to Ward, "[h]ad the five telephones he had on his person been preserved, Ward could have provided proof of his travels . . . to show that he was not in Rapid City" at times relevant to the offense. No record evidence supported Ward's claims about these phones' existence or disappearance beyond Ward's own testimony at a hearing on his motion to dismiss

---

[6]We also reject Ward's argument that the officers were required to cease the stop upon realizing that the driver was not M.B., as they had originally expected. The stop was lawfully predicated on the traffic violations, and the officers were within constitutional bounds to complete it. See United States v. White, 928 F.3d 734, 740 (8th Cir. 2019) (explaining "that the subjective intent of an officer cannot vitiate otherwise objectively reasonable conduct"). For the same reason, we need not consider whether the officers had grounds to stop the car independent of the traffic violations they observed.

the indictment, and the district court found that testimony was not credible.[7] Ward offers insufficient reason to doubt the district court's assessment. See United States v. Puebla-Zamora, 996 F.3d 535, 539 (8th Cir. 2021) ("The trial court has a distinct advantage in evaluating witness credibility, and its credibility determinations are virtually unreviewable on appeal." (quoting United States v. Ford, 888 F.3d 922, 927 (8th Cir. 2018))).

Ward also argues that officers failed to preserve two bags they found in the Fiesta's trunk, despite photographing the bags' contents and entering some of those contents into evidence. Ward claims the bags had potential exculpatory value because DNA evidence remaining in the bags could have shown they belonged to someone else. The officers consistently stated that they did not collect the bags, explaining that there was no obvious value in cataloguing the bags themselves after removing their contents, and that collecting and cataloguing every item recovered from a scene would be impracticable. The district court credited this testimony,[8] and we see no indication in the record of bad faith on the officers' part in failing to collect the bags. See Bugh, 701 F.3d at 894. Without "'proof of an official animus or a conscious effort to' destroy exculpatory evidence," Ward's claim "necessarily fails." See McKay v. City of St. Louis, 960 F.3d 1094, 1100 (8th Cir. 2020) (quoting Jimerson v. Payne, 957 F.3d 916, 926 (8th Cir. 2020)). The district court did not err in denying Ward's motion.[9] For the same reasons, the district court did not abuse its

---

[7]Officers recovered six other phones on the scene—five belonging to Ward and one belonging to B.B.—which *were* entered into evidence.

[8]Ward notes that at trial, B.B. testified that "[t]he police took [Ward's] bags." But in its order denying Ward's motion for judgment of acquittal, the district court declined to reconsider its finding, citing the officers' consistent testimony to the contrary and other corroborating evidence. We decline to disturb this renewed credibility assessment. Puebla-Zamora, 996 F.3d at 539.

[9]Relatedly, Ward argues that he should have been permitted to view law enforcement policies that might have contained impeachment evidence. Before trial, Ward moved for discovery of law enforcement policies on warrantless searches and arrests, chain of custody, evidence handling, and handling of informants. The district

discretion when denying his request to instruct the jury on lost or destroyed evidence. See United States v. Tyerman, 701 F.3d 552, 561 (8th Cir. 2012) (reviewing denial of spoliation instruction for abuse of discretion, recognizing a defendant's entitlement to such an instruction upon "a showing of the government's bad faith").

## III.

Finally, Ward challenges the sufficiency of the evidence on both counts. Our review is "de novo, viewing evidence in the light most favorable to the jury's verdict, resolving conflicts in the government's favor, and accepting all reasonable inferences that support the verdict." United States v. Tillman, 765 F.3d 831, 833 (8th Cir. 2014) (quoting United States v. Harris-Thompson, 751 F.3d 590, 598 (8th Cir. 2014)). Reversal is appropriate "only if no reasonable jury could have found the defendant guilty beyond a reasonable doubt." Id. (quoting United States v. Brooks, 715 F.3d 1069, 1081 (8th Cir. 2013)).

---

court partially granted the motion, ordering the government to produce certain law enforcement manuals concerning evidence handling. As per the order, the court reviewed the policies *in camera*, and later ruled from the bench that "the documents . . . do not constitute Brady . . . matters, and they're not discoverable under Rule 16 of the criminal rules."

In criminal cases, we have held that any "error by the district court in administering the discovery rules is reversible only if the error is shown to prejudice the substantial rights of the defendant." United States v. Vitale, 728 F.2d 1090, 1093 (8th Cir. 1984); see also United States v. Woods, 978 F.3d 554, 564 (8th Cir. 2020) (noting that we "giv[e] due deference to the district court's role in managing trials and discovery in criminal prosecutions"). In Ward's view, with the documents, he could have potentially impeached officers by suggesting they ignored protocol in disposing of the bags, and that DNA evidence might have proven the bags belonged to someone else. But evidence showed Ward in possession of the bags: the jury saw photographs of him placing them in the Fiesta's trunk, and a key on his person opened a container inside one of them that held money and drugs. Ward fails to explain what prejudice he suffered from the court's order, nor do we see any.

The jury was instructed that to convict Ward for distribution of fentanyl causing serious bodily injury, the government needed to prove beyond a reasonable doubt that Ward: 1) "knowingly or intentionally transferred fentanyl to [K.S.]"; 2) "knew that the substance was fentanyl"; and 3) "that [K.S.] would not have suffered serious bodily injury but for the use of that same fentanyl transferred by Ward." See 21 U.S.C. § 841(a), (b)(1)(C). Ward raises two sufficiency challenges to his conviction on this count.

1.

First, Ward argues that there was insufficient evidence to prove that fentanyl, as opposed to a seizure disorder, caused K.S.'s injury.[10] See Burrage v. United States, 571 U.S. 204, 216 (2014) (holding that 21 U.S.C. § 841(b)(1) requires showing "but-for causality"). Relying on Burrage, Ward argues that because the jury heard evidence that K.S. suffered from a seizure disorder, and thus might have had a seizure instead of overdosing on fentanyl, the government did not establish that fentanyl was the but-for cause of K.S.'s injury.

Ward's reliance on Burrage is misplaced. In Burrage, the defendant distributed heroin to a man who died after taking the heroin in combination with other substances, and neither of the two medical experts who testified could say whether the heroin was independently sufficient to cause the victim's overdose. Id. at 206–07, 218–19. Accordingly, the Supreme Court held that "where use of the drug distributed by the defendant is not an independently sufficient cause of the victim's

---

[10]Ward suggests that even if K.S. overdosed, he did not suffer a serious injury because he was revived. But we have rejected this argument. See United States v. Cooper, 990 F.3d 576, 583 (8th Cir. 2021) (noting, where victim was revived, that a "jury could have concluded . . . [they] faced a substantial risk of death, and thereby sustained serious bodily injury, from the use of the substance").

death or serious bodily injury, a defendant cannot be liable under . . . 21 U.S.C. § 841(b)(1)(C) unless such use is a but-for cause of the death or injury." Id. at 218–19. By contrast, in Ward's case, the jury heard evidence that the fentanyl K.S. smoked was an independently sufficient cause of his injury. Accordingly, the jury heard evidence supporting two theories—K.S. overdosed on fentanyl, or K.S. had a seizure—at least the former of which could have completely caused his symptoms that day. "This created a factual issue for the jury to resolve rather than an absolute legal bar to conviction." United States v. Seals, 915 F.3d 1203, 1206 (8th Cir. 2019) (upholding conviction where evidence showed victim who overdosed had two kinds of mixed fentanyl in his blood, either of which "could have been an independently sufficient cause" of the overdose, and where the timing of the overdose suggested the defendant's fentanyl was the but-for cause).

Moreover, the jury heard sufficient evidence to conclude that K.S. overdosed on fentanyl as opposed to having a seizure. K.S. testified that he passed out directly after taking fentanyl with a man named C.A. In turn, C.A. testified that after smoking with K.S., C.A. returned from the bathroom to discover K.S. lying on a bed, his lips turning blue. K.S.'s wife, who was in the home, testified that K.S.'s face turned blue and that he began to wake up less than a minute after receiving Narcan. K.S. explicitly testified that he overdosed. Additionally, Dr. Donald Habbe, a forensic pathologist, reviewed law enforcement records and the paramedics' reports and concluded that K.S.'s symptoms were "very much consistent with" a fentanyl overdose. He explained that common indicia of a fentanyl overdose include extremities turning blue and quick revival with Narcan. Moreover, Dr. Habbe testified that "[f]rom the information that was provided to me, there's no one that describes anything like seizure-like activity." And K.S.'s ex-girlfriend and wife, both of whom said they had witnessed K.S.'s seizures in the past, claimed that he exhibited different symptoms: his seizures caused him to shake, not lay "lifeless" as he had the day in question.

Ward argues that the government provided insufficient testimony from a medical expert supporting the theory that K.S. overdosed. He suggests that testimony

from a treating physician, or more concrete medical evidence of an overdose than what the jury heard, was required for his conviction to stand. But Ward points to no case holding that medical records or a treating physician's testimony is required, and in upholding convictions under § 841(b)(1)(C), we have explained that a jury may credit strong circumstantial indicia of an overdose. See United States v. Cathey, 997 F.3d 827, 832–33 (8th Cir. 2021) ("[W]hen the victim purchased a drug mixture, ingested it, and collapsed within . . . minutes, a 'reasonable jury could find that the tight chain of events strongly suggested on its own that the [drug] mixture caused the overdose.'" (third alteration in original) (quoting Seals, 915 F.3d at 1206)).

Viewing the record in the light most favorable to the verdict, the "tight chain of events" between K.S. taking fentanyl, losing consciousness, and quickly reviving after being given Narcan, paired with testimony from Dr. Habbe confirming that K.S.'s symptoms were consistent with a fentanyl overdose and inconsistent with a seizure, amounted to sufficient evidence for a reasonable jury to find that fentanyl caused K.S. to suffer a serious bodily injury. See Seals, 915 F.3d at 1206; Cooper, 990 F.3d at 583.

2.

Next, Ward argues that there was insufficient evidence that he distributed the fentanyl on which K.S. overdosed. See Cooper, 990 F.3d at 581–82 (noting that the government needs to prove the defendant (1) "knowingly or intentionally distributed a controlled substance and (2) serious bodily injury 'result[ed] from' the use of that controlled substance." (alteration in original) (quoting United States v. Lewis, 895 F.3d 1004, 1009 (8th Cir. 2018))).

Sufficient evidence supported the jury's conclusion. C.A. testified that in 2021 and 2022 he distributed fentanyl in Rapid City with Ward and a man named D.Y. The jury heard testimony that Ward distributed fentanyl pills to D.Y., who would then pass them on to C.A. Both C.A. and D.Y. testified that in February and March of 2022, Ward was the sole source of the fentanyl they sold. Additionally, both C.A.

and D.Y. testified that in early March 2022, Ward went to Denver and returned with fentanyl pills. Text messages showed C.A. and D.Y. discussing driving to distribute fentanyl on the morning of March 15, the day of K.S.'s apparent overdose. The jury heard testimony from C.A. that on that day, C.A. and D.Y. met up with K.S., the three men smoked fentanyl in the car, and then C.A. and K.S. went inside K.S.'s ex-girlfriend's home to smoke more of it, at which point K.S. overdosed.

Arguing that this evidence was insufficient to convict him, Ward points to trial testimony suggesting that Ward and D.Y. temporarily stopped working with C.A. Specifically, D.Y. testified that at some point, C.A. "abandoned" D.Y. and Ward for "[a] week or so" instead of paying them for drugs they had given him, but D.Y. did not "know for certain" when that was. Ward also points to a text message from C.A. to D.Y. on March 12 in which C.A. wrote: "Other homie got blues to sell. Could be cheaper—or cheap enough." D.Y. testified that he understood the text to mean that C.A. "had another person that he was going through."

At best, this evidence produced slight inconsistencies in the testimony the jury heard, and we will not disturb the jury's choice to credit the weight of the evidence indicating that Ward was the source of the fentanyl. See United States v. Johnson, 39 F.4th 1047, 1052 (8th Cir. 2022) ("'[M]inor inconsistencies' in the testimony supporting a conviction 'do not require acquittal.'" (quoting United States v. Bradley, 643 F.3d 1121, 1126 (8th Cir. 2011))); see also id. (noting that "'only . . . in extreme circumstances, such as when the witness testified to facts that are physically impossible,' will we disturb the factfinder's decision to credit one witness's testimony over another's" (alteration in original) (quoting United States v. Jones, 628 F.3d 1044, 1048 (8th Cir. 2011))).

B.

Finally, Ward argues that insufficient evidence supported his conviction for conspiring to deal fentanyl. "To prove a conspiracy to distribute drugs under 21 U.S.C. § 846, the government must show: (1) that there was a conspiracy, i.e., an

-12-

agreement to distribute the drugs; (2) that the defendant knew of the conspiracy; and (3) that the defendant intentionally or knowingly joined the conspiracy." United States v. Trejo, 831 F.3d 1090, 1094 (8th Cir. 2016) (citation omitted).

Sufficient evidence established Ward's involvement in a fentanyl-distribution conspiracy. Numerous witnesses—including C.A. and D.Y.—testified to an arrangement whereby Ward would provide the men with fentanyl to sell in Rapid City. C.A. called the enterprise "Ward's baby." C.A. would interface with buyers on the street, while Ward and D.Y. would typically distribute the fentanyl pills from a hotel, switching locations every few days to avoid getting noticed. According to C.A., this arrangement insulated Ward and D.Y. from both robberies and law enforcement. Additionally, D.Y. testified that he would "turn . . . in" the proceeds of his fentanyl sales to Ward. Finally, C.A. testified to the large amount of fentanyl implicated in the conspiracy: he claimed that during one fentanyl deal, he saw Ward reach into a bag with around 1000 pills in it and hand some of those pills to D.Y., who then handed them to C.A. See United States v. Davis, 867 F.3d 1021, 1033 (8th Cir. 2017) ("Large drug quantities, rather than personal-use amounts, also support an inference that the defendant knew that he participated in a conspiracy, which can be 'shown through evidence of an ongoing relationship the purpose of which is buying and selling drugs.'" (quoting United States v. Moya, 690 F.3d 944, 949 (8th Cir. 2012))).

Ward claims that there was no evidence of a "specific price" or what kind of "agreement was between the parties." But "the government is not required to present direct evidence of an explicit agreement; juries may rely upon circumstantial evidence to discern a tacit agreement or understanding between the co-conspirators." United States v. Hodge, 594 F.3d 614, 618 (8th Cir. 2010). Ward also points to evidence suggesting that C.A. stopped communicating with D.Y. and Ward for one week in March 2022, and that at some point, D.Y. sold methamphetamine he sourced from others while continuing to sell fentanyl with Ward. We do not see how this testimony renders insufficient the substantial amount of evidence the jury heard directly implicating Ward in a months-long conspiracy to distribute fentanyl. Cf.

United States v. Shelledy, 961 F.3d 1014, 1020 (8th Cir. 2020) (noting the question is whether sufficient evidence showed that defendant "conspired to distribute or possess with the intent to distribute the drugs *at issue*" (emphasis added)).

IV.

The judgment of the district court is affirmed.

_____