# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 03-1028

———————

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Plaintiff - Appellee, | * | |
| | * | |
| v. | * | Appeal from the United States |
| | * | District Court for the District |
| Fernando Nambo-Barajas, | * | of Minnesota. |
| | * | |
| Defendant - Appellant. | * | |

———————

Submitted: May 12, 2003

Filed: July 31, 2003

———————

Before BOWMAN, HEANEY, and BYE, Circuit Judges.

———————

BYE, Circuit Judge.

A jury convicted Fernando Nambo-Barajas of conspiracy to distribute more than 500 grams of a methamphetamine substance in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A) and 846. The district court[1] denied Nambo-Barajas's motions for judgment of acquittal or alternatively a new trial. The district court also refused to grant Nambo-Barajas a 4-level minimal-role-in-the-offense downward adjustment. Nambo-Barajas appeals his conviction and sentence, and we affirm.

———

[1]The Honorable Ann D. Montgomery, United States District Judge for the District of Minnesota.

On June 5, 2002, Special Agent Enrique Vazquez of the Minnesota Bureau of Criminal Apprehension, acting with the cooperation of a confidential informant (CI), arranged to buy drugs from an individual known as Hilberto Maltos (later identified as Jose Francisco Puente-Ibarra). Agent Vazquez had the CI call Puente-Ibarra and arrange to buy three pounds of methamphetamine. The CI and Puente-Ibarra agreed to meet at 2:00 p.m. on June 5, 2002, in the Menards parking lot in Waite Park, Minnesota.

Puente-Ibarra lived in a mobile home park in Avon, Minnesota, approximately fifteen miles from Waite Park. At 12:45 p.m. on June 5, officers set up surveillance on Puente-Ibarra's mobile home. Officer Jim Steve stationed himself along the shoulder of nearby Interstate Highway 94 and observed Puente-Ibarra from a distance of approximately 200 yards. He periodically used binoculars to monitor Puente-Ibarra's residence but did so sparingly so as not to give away his identity. Another officer watched the entrance/exit to the mobile home park and a third was stationed outside the mobile home park to follow Puente-Ibarra if he left in a vehicle.

Agent Vasquez and the CI arrived at the Menards parking lot around 1:00 p.m. The CI placed a call to Puente-Ibarra's cell phone at 1:03 p.m., and Puente-Ibarra told him he was waiting for someone to arrive with the drugs. At 1:15 p.m., Officer Steve observed Puente-Ibarra talking to a woman outside his mobile home. After talking to Puente-Ibarra, the woman and two children who accompanied her, got into a car and drove out of the park. They were not followed. At 1:25 p.m., Agent Vasquez had the CI place a second call to Puente-Ibarra's cell phone. Puente-Ibarra informed the CI the "individuals" had just arrived and he would be leaving soon. Puente-Ibarra, however, remained at his mobile home until 1:58 p.m., at which time he got into his car and drove to the opposite end of the trailer park. The officers lost sight of Puente-Ibarra for a time but knew he remained in the trailer park because they did not see him

leave the park. Approximately three minutes after driving off, Puente-Ibarra returned to his mobile home. He parked his car, sat in it for a short period of time, then got out and looked around before entering his mobile home. Over the next 20-25 minutes, officers observed Puente-Ibarra get into his car again, get back out of the car, look down the street, look around, and go in and out of his mobile home several times.

At 2:01 p.m., Agent Vasquez had the CI place a third call to Puente-Ibarra's cell phone. Puente-Ibarra answered and said he would be leaving soon for Waite Park but he would be driving slowly. At approximately 2:23 p.m., the CI called Puente-Ibarra for a fourth time but no one answered.

At approximately 2:25 p.m., Officer Steve observed Puente-Ibarra standing next to his car which was parked adjacent to the mobile home. Steve watched as a Hispanic male with bushy red hair approached the trailer. The red-haired man was later identified as Nambo-Barajas. Steve testified Nambo-Barajas approached Puente-Ibarra and spoke with him briefly. Nambo-Barajas then walked over to Puente-Ibarra's car and got in. He remained in the car for a few moments, got out, shook hands with Puente-Ibarra and walked away.

Officers observing Puente-Ibarra and the mobile home park did not notice Nambo-Barajas carrying anything when he approached Puente-Ibarra. Two of Puente-Ibarra's next-door neighbors, however, testified they saw a "Mexican" man with red or orange hair carrying a cardboard Budweiser Light box walk up to Puente-Ibarra and talk to him. The witnesses, a brother and sister - John Osfalg (14) and Amy Osfalg (23) - both have mental disabilities which made it difficult for them to testify at trial. As a result, the district court allowed the government to develop their trial testimony using leading questions.

After Nambo-Barajas walked away, Puente-Ibarra got into his car and left for Waite Park. At 2:27 p.m., while en route, Puente-Ibarra placed a call to the CI letting

him know he was on his way. Puente-Ibarra arrived at the Menards parking lot at approximately 2:43 p.m. He removed three pounds of methamphetamine from under the front seat of his car and was arrested when he delivered it to the CI and Agent Vasquez. Following his arrest, police searched Puente-Ibarra's vehicle and found, among other things, an empty cardboard Budweiser Light box in the back seat.

After arresting Puente-Ibarra, the officers returned to the Avon mobile home park to locate the red-haired man they had observed talking with Puente-Ibarra. The officers saw him walk out of a mobile home about three or four units down from Puente-Ibarra's and arrested him. The man was later identified as Nambo-Barajas. A search of Nambo-Barajas's person and his vehicle uncovered no evidence of drug dealing.

Puente-Ibarra was charged with various drug offenses and pleaded guilty. Nambo-Barajas went to trial in September 2002 and was convicted on the sole count of conspiracy to distribute an amount of methamphetamine in excess of 500 grams. Puente-Ibarra did not testify against Nambo-Barajas or reveal his drug source.

Following his conviction, Nambo-Barajas moved for judgment of acquittal or a new trial arguing the evidence was insufficient to sustain the conviction, and the district court erred by allowing the government to use leading questions on direct examination of the Osfalgs. The motions were both denied. At sentencing, Nambo-Barajas argued for but was refused a 4-level downward adjustment for his minimal role in the offense. The district court sentenced him to a term of 121 months incarceration. On appeal, Nambo-Barajas argues the district court erred by refusing to grant either his motion for judgment of acquittal or a new trial. Nambo-Barajas also appeals the district court's refusal to apply the 4-level role-in-the-offense reduction.

## II

Nambo-Barajas argues the evidence was insufficient to support the conspiracy conviction and the district court erred by refusing to grant his motion for judgment of acquittal.

We review the district court's denial of a motion for judgment of acquittal de novo. United States v. Campa-Fabela, 210 F.3d 837, 839 (8th Cir. 2000). When judgment of acquittal is sought on the basis of insufficiency of the evidence we view the evidence in the light most favorable to the verdict and give the government the benefit of all reasonable inferences that can logically be drawn from the evidence. United States v. James, 172 F.3d 588, 591 (8th Cir. 1999) (citations omitted). The verdict must be upheld if "there is an interpretation of the evidence that would allow a reasonable-minded jury to find the defendant[] guilty beyond a reasonable doubt." United States v. Vig, 167 F.3d 443, 445 (8th Cir. 1999). We will not lightly overturn the jury's verdict, United States v. Gillings, 156 F.3d 857, 860 (8th Cir. 1998), and "[r]eversal is appropriate only where a reasonable jury could not have found all the elements of the offense beyond a reasonable doubt." United States v. Armstrong, 253 F.3d 335, 336 (8th Cir. 2001).

To convict a defendant of conspiracy to distribute methamphetamine, the government must prove beyond a reasonable doubt 1) the existence of an agreement to achieve some illegal purpose, 2) the defendant's knowledge of the agreement, and 3) the defendant's knowing participation in the conspiracy. United States v. Cruz, 285 F.3d 692, 700 (8th Cir. 2002). "Either direct or circumstantial evidence can provide the basis for a conviction." United States v. Jiminez-Perez, 238 F.3d 970, 973 (8th Cir. 2001). Indeed, evidence in a conspiracy case will more often be circumstantial due to an illegal conspiracy's "necessary aspect of secrecy." United States v. Gooden, 892 F.2d 725, 729 (8th Cir. 1989).

Nambo argues the evidence against him was weak, unreliable and circumstantial. Our review of the record satisfies us that the government's evidence, while not overwhelming, was sufficient to sustain the jury's verdict.

Puente-Ibarra had a 2:00 p.m. appointment to sell drugs, and despite four phone calls from the CI he did not leave his mobile home until almost 2:30 p.m. Puente-Ibarra appeared to be anxiously waiting for something or someone and told the CI he was waiting for the drugs to be delivered. Almost immediately after his contact with Nambo-Barajas, Puente-Ibarra left for Waite Park and arrived with three pounds of methamphetamine. Additionally, the Osfalgs observed Nambo-Barajas carrying a cardboard Budweiser Light box as he approached Puente-Ibarra, and the officers observed him briefly enter Puente-Ibarra's car. Following Puente-Ibarra's arrest, an empty Budweiser Light box was found in the back seat of his car.

None of this evidence directly proves Puente-Ibarra and Nambo-Barajas were engaged in a conspiracy to distribute methamphetamine. But it is not unreasonable to conclude Nambo-Barajas was Puente-Ibarra's source for the drugs. While there could be some other explanation for what occurred, a reasonable jury could conclude beyond a reasonable doubt a conspiracy existed between Puente-Ibarra and Nambo-Barajas. Accordingly, we affirm the district court's denial of the motion for judgment of acquittal.

Nambo-Barajas next argues the district court erred by refusing to grant a new trial based upon insufficiency of the evidence.

This court will reverse a district court's denial of a motion for new trial if the district court abused its discretion. United States v. Robbins, 21 F.3d 297, 299 (8th Cir. 1994); United States v. McBride, 862 F.2d 1316, 1319 (8th Cir. 1988).

An abuse of discretion occurs when a relevant factor that should have been given significant weight is not considered, when an irrelevant or improper factor is considered and given significant weight, or when all proper and no improper factors are considered, but the court in weighing those factors commits a clear error of judgment.

United States v. Kramer, 827 F.2d 1174, 1179 (8th Cir. 1987).

The trial court "has wide discretion in deciding whether to grant a new trial in the interest of justice," but the authority to set aside a jury verdict and grant a new trial "should be exercised sparingly and with caution." United States v. Lincoln, 630 F.2d 1313, 1319 (8th Cir. 1980).

The district court may grant a motion for a new trial "if the interests of justice so require." Fed. R. Crim. P. 33. When a defendant moves for a new trial arguing the verdict is contrary to the weight of the evidence, the district court should grant the motion only if

the evidence weighs heavily enough against the verdict that a miscarriage of justice may have occurred . . . . In making this determination, the court need not view the evidence in the light most favorable to the government, but may instead weigh the evidence and evaluate for itself the credibility of the witnesses.

United States v. Lacey, 219 F.3d 779, 783-84 (8th Cir. 2000).

If, "despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred, [the district court] may set aside the verdict, grant a new trial, and submit the issues for determination by another jury." Lincoln, 630 F.2d at 1319.

Most of Nambo-Barajas's arguments in favor of a new trial are the same as those advanced in support of the motion for judgment of acquittal. To the extent the arguments overlap, we affirm the district court's denial of Nambo-Barajas's new trial motion. One additional argument, however, involves the district court's reference to a booking photograph of Nambo-Barajas not admitted into evidence at trial. By referring to the photograph, Nambo-Barajas contends the district court improperly went outside the record to deny his motion for new trial.

The district court's order denying the motion for new trial addresses Nambo-Barajas's attack on the credibility of the Osfalgs' testimony. The order discusses the difficulties the Osfalgs had testifying at trial but nonetheless concludes their testimony was credible. For example, the district court noted the Osfalgs testified about a "Mexican" man with red or orange hair who lived in the trailer park; a fact they were unlikely to fabricate. Nambo-Barajas, however, had done away with his colorful locks before trial, so the district court referred to the booking photograph to show that the Osfalgs' testimony was consistent with Nambo-Barajas's appearance at the time of the drug sale. In doing so, the district court did not introduce anything into the trial not already in evidence. The Osfalgs and police had all testified to Nambo-Barajas's appearance on the date of the offense. Thus, the district court committed no error when it noted the Osfalgs' testimony about the red-haired man was supported by the booking photograph.

Nambo-Barajas's final argument in support of a new trial focuses on the district court's decision to allow the government to conduct its direct examination of the Osfalgs using leading questions.

Leading questions are generally prohibited during direct examination, "except as necessary to develop the witness' testimony." Fed. R. Evid. 611(c). "The use of leading questions is a matter left to the discretion of the district court," United States v. Butler, 56 F.3d 941, 943 (8th Cir. 1995), because "the trial court is in a better

position than this court to determine the emotional condition and forthrightness of the witness and the need for counsel to use leading questions to develop the witness's testimony." United States v. Goodlow, 105 F.3d 1203, 1207-08 (8th Cir. 1997) (citation omitted).

Our review of the record indicates the district court did not abuse its discretion in allowing the use of leading questions. Indeed, many of the questions Nambo-Barajas cites as improper were not leading at all. We find nothing in the examination of the Osfalgs to suggest the government's questioning resulted in false or inaccurate testimony.

Nambo-Barajas next points to meetings between the prosecutor and the Osfalgs prior to their appearances in court, and suggests their testimony was tainted by improper government coaching. Meeting with a witness before trial, by itself, suggests no impropriety. Furthermore, the pretrial meetings were covered by Nambo-Barajas during cross-examination and the jury was free to consider their impact on the Osfalgs' credibility. Accordingly, the district court's denial of Nambo-Barajas's motion for a new trial is affirmed.

Finally, Nambo-Barajas argues the district court erred by refusing to grant a 4-level downward adjustment for his minimal role in the offense.

Application of the sentencing guidelines is reviewed de novo, but factual determinations are reviewed for clear error. United States v. Moore, 242 F.3d 1080, 1081 (8th Cir. 2001). Whether a defendant qualifies for a role reduction is a question of fact. United States v. Surratt, 172 F.3d 559, 567 (8th Cir. 1999). The sentencing guidelines provide for a reduction of between two and four levels to reflect a defendant's mitigating role in the offense. U.S.S.G. § 3B1.2 (1999). A defendant's role in the offense is measured by the relevant conduct for which he is held responsible. United States v. McCarthy, 97 F.3d 1562, 1574 (8th Cir. 1996) ("Once

a defendant's relevant conduct for sentencing purposes has been determined, that same relevant conduct is used not only in determining the defendant's base offense level but also for any role in the offense adjustments made pursuant to Chapter 3 of the Guidelines."); see also United States v. Ramos-Torres, 187 F.3d 909, 915 (8th Cir. 1999) ("The propriety of a downward adjustment is determined by comparing the acts of each participant in relation to the relevant conduct for which the participant is held accountable and by measuring each participant's individual acts and relative culpability against the elements of the offense.") (citation omitted).

A four-level reduction for minimal participation, pursuant to U.S.S.G. § 3B1.2(a), applies to defendants who are "plainly among the least culpable of those involved in the conduct of a group." U.S.S.G. § 3B1.2, cmt. 4. The role reduction for minimal participation was intended to be used infrequently, and should be reserved for cases where the defendant does not know or understand the scope of the illegal enterprise or where the defendant's involvement was insignificant. Id.; United States v. O'Dell, 204 F.3d 829, 837 (8th Cir. 2000). The defendant bears the burden of proving the reduction applies. See United States v. Thompson, 60 F.3d 514, 517 (8th Cir. 1995).

The facts show Nambo-Barajas was an integral part of the conspiracy. Puente-Ibarra would have been unable to deliver the drugs if Nambo-Barajas had not first supplied them. Nambo-Barajas's conduct is different from Puente-Ibarra's but cannot be described as minimal in comparison. The district court's findings of fact are not clearly erroneous and we affirm the sentence.

III

The judgment and sentence of the district court are affirmed.

-10-

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.