# United States Court of Appeals
### For the Eighth Circuit

_____

No. 13-2410

_____

United States of America

*Plaintiff - Appellee*

v.

Geshik-O-Binese Martin

*Defendant - Appellant*

_____

No. 13-3221

_____

United States of America

*Plaintiff - Appellee*

v.

David John Martin

*Defendant - Appellant*

_____

No. 14-1039

_____

United States of America

*Plaintiff - Appellee*

v.

Edward McCabe Robinson

*Defendant - Appellant*
_____

Appeals from United States District Court
for the District of Minnesota - St. Paul
_____

Submitted: November 13, 2014
Filed: February 4, 2015
_____

Before MURPHY, MELLOY, and BENTON, Circuit Judges.
_____

MURPHY, Circuit Judge.

A jury convicted Geshik-O-Binese Martin and Edward Robinson of robbing and murdering Craig Roy and Darla Beaulieu on the Red Lake Indian Reservation in violation of 18 U.S.C. § 1153. David Martin was acquitted of the murder charges but also convicted of robbery under § 1153. Geshik Martin, Edward Robinson, and David Martin now appeal.

Appellants claim improper ex parte contact by the district court with the jury venire. They also challenge their convictions. Geshik Martin contends that the government failed to prove his Indian status under § 1153 even though he stipulated to that fact. Edward Robinson asserts that the district court erred by denying his motions to sever and allowing the prosecutor to comment on his failure to testify. David Martin argues that the court erred by declining to give a lesser included instruction on theft and by enhancing his sentence by six levels under U.S.S.G. § 2B3.1(b)(3)(C) for infliction of permanent bodily injury. We affirm.

-2-

I.

Law enforcement responded on January 1, 2011 to a fire at the home of Craig Roy on the Red Lake Indian Reservation, a large reservation in northern Minnesota adjacent to the Canadian border. Roy's residence was already engulfed in flames and collapsed before fire crews could extinguish the fire. The next morning the bodies of Roy and his partner, Darla Beaulieu, were retrieved from the rubble. Both bodies were charred beyond recognition. Autopsies indicated that Roy and Beaulieu had been stabbed multiple times before the fire and that their death was caused by exsanguination. Details of the crimes were discovered over several months. Law enforcement learned that Roy and Beaulieu had attended a New Year's Eve party the night before their deaths and that Beaulieu had a fight there with a woman named Vicki Neadeau. Roy defended Beaulieu and severely injured Neadeau who left the party to tell Terin Stately and other friends about his attack.

According to Stately, Geshik Martin had reacted to the news by urging Edward Robinson, David Martin, Kevin Needham, and George Martin to get revenge on Roy by robbing him of his cocaine. After everyone had allegedly agreed to the plan, Stately drove the group to Roy's home and waited in the car while the others went inside. They emerged after 10 to 20 minutes with Robinson carrying a long gun. As Stately drove away from the home, she asked what had happened inside. No one answered.

In August 2012, Geshik Martin, Robinson, David Martin, Needham, George Martin, and Stately were charged under 18 U.S.C. § 1153 for robbery and the deaths of Roy and Beaulieu. Geshik Martin, Robinson, David Martin, and George Martin were also charged with first and second degree murder in violation of § 1153. Section 1153(a) allows the government to prosecute certain "offenses committed within Indian country," including any Indian who has committed murder or robbery against another

-3-

person.  18 U.S.C. § 1153(a).  Geshik Martin signed a stipulation of fact prior to trial stating "the following facts are true and the jury must treat these facts as having been proven at trial:  The defendant is an Indian."  Stately and Needham pled guilty prior to trial without contesting their Indian status under § 1153(a).  Although Robinson also did not contest his Indian status, he moved to sever due to antagonistic defenses among the codefendants.  While Robinson intended to testify that he had not been present at Roy's home during the murders, Geshik Martin intended to testify that all defendants had been present but that they had not planned to murder Roy.  The district court denied the motions to sever, stating that "with the proper instructions to the jury . . . [it could] deliver a fair trial."

## A.

Jury selection began on February 25, 2013.  As counsel prepared to exercise their peremptory challenges, the district court commented that the jurors were waiting to be called forward and offered to meet separately with the 51 person jury venire in order to thank them for their service.  The court informed counsel that he planned to answer questions about the differences between federal and state judges but would remain "hands off on cases."  All counsel consented as long as the court's comments were recorded.

As agreed, the court then spoke with the jury venire without counsel or any of the parties present.  He explained that he would "just kind of make small-talk" and answer any questions the jurors might have.  He discussed the differences between state and federal judges, noting that the latter are "appointed for life" while the former are first appointed by the governor and must later run for election to a six year term. He also discussed the methods for summoning jurors, stating that Minnesota ranks "either the first or in the top three for the last few years [for] the highest response rate by citizens to jury summons."  He also explained how jury selection had changed since he "was a young trial lawyer in the seventies, [when] you would show up for

-4-

jury selection . . . and you would have primarily retired individuals, unemployed people, or part-time students, [but] . . . we have [now] gone [to] almost the other extreme where we have excused almost no one." The district court commented that although lawyers are commonly stereotyped for "tricking jurors," juries "usually always make the right decision" but occasionally "take the law into their own hands" by engaging in jury nullification. While the court could not "comment on [this] case," he mentioned the "O.J. Simpson case" and the "Marilyn Manson trial" in explaining jury sequestration and the duty not to discuss a case during trial. The court closed with this comment: "If it is your secret dream or goal to sit on a case, I hope you get the opportunity . . . [and] if there are no further questions, we will get set up [for trial]."

B.

At trial Stately testified that Geshik Martin, Robinson, David Martin, Needham, and George Martin had conspired to get revenge on Roy for having attacked Neadeau at a New Year's Eve party. David Martin had allegedly informed Geshik Martin that he knew where Roy stored his crack cocaine, and a plan was devised to travel to Roy's home in order to steal it. According to Stately, the group had agreed that David Martin, who had been living with Roy, would knock on the front door under the guise of retrieving his clothes. The others would then rush in behind him to carry out the robbery. Stately testified that after she had driven "the boys" to Roy's home, Geshik Martin returned to the car with blood on his arms, Robinson was carrying a long gun, and all of the defendants disposed of their clothes in garbage bags. Stately also testified that when she had asked Geshik Martin what had happened inside the home, he had responded, "they got killed . . . and [we] lit the house on fire."

In contrast to Stately's testimony, Geshik Martin testified that he had not intended to rob Roy. Rather, he had gone to Roy's home in order to retrieve David Martin's clothes. He also claimed that he had stabbed Roy and Beaulieu in self

defense after Roy attacked him inside the home. David Martin similarly testified that he had gone to Roy's home to get his clothes and that he and the other defendants had not been inside the home at the time Roy attacked Geshik Martin. Robinson and George Martin did not testify, but their counsel argued that they had no knowledge of the crimes. The prosecutor pointed out in her closing argument that: "the only people that [actually talked] about what occurred at the house are Geshik Martin and David Martin." Geshik Martin's testimony should be closely evaluated she said because it "just is incredible" and full of "internal inconsistencies" undermining his claim of self defense.

After the evidence was received, the district court discussed the jury instructions with counsel. David Martin proposed a lesser included offense instruction for theft. He argued that even if the jury found that he had taken cocaine from Roy, the jury could still find that he had not engaged in a "violent act" and convict him of theft rather than robbery. The government responded that there was no basis for a theft instruction because the evidence showed that David Martin had participated in "forced violence and intimidation for crack cocaine." The district court decided not to give the instruction.

The jury convicted Geshik Martin and Robinson on all counts of murder and robbery. David Martin was also convicted of robbery, but he was acquitted of murder. George Martin was acquitted on all counts. The district court sentenced Geshik Martin and Robinson to consecutive terms of life imprisonment for their murder convictions and a concurrent term of 15 years for robbery. David Martin was sentenced to 160 months on his robbery conviction after application of a U.S.S.G. § 2B3.1(b)(3)(C) six level enhancement for the infliction of permanent bodily injury. In applying that enhancement, the district court found that "everybody knew, if not a murder, [there] would be violence in [Roy's] home and there would be injury in that home to one or both parties." Geshik Martin, Edward Robinson, and David Martin now appeal, claiming numerous errors before, during, and after trial.

## II.

### A.

Appellants argue that the district court erred during its ex parte meeting with the jury venire by commenting on high profile cases, certain lawyer stereotypes, and jury nullification. They contend that these ex parte statements violated their constitutional rights and Federal Rule of Criminal Procedure 43(a). Rule 43(a)(2) provides that "the defendant must be present at . . . every trial stage, including jury impanelment and the return of the verdict." Fed. R. Crim. P. 43(a)(2). The Fifth and Sixth Amendments also protect a "criminal defendant's right to be present at all stages of the trial." Stewart v. Nix, 972 F.2d 967, 971 (8th Cir. 1992). The scope of Rule 43(a)(2) is broader than that constitutional right because it "incorporated the more expansive common law understanding of the right." United States v. Reyes, 764 F.3d 1184, 1189 (9th Cir. 2014); accord United States v. Gunter, 631 F.2d 583, 589 (8th Cir. 1980). Neither the Supreme Court nor this court has addressed whether contacts between the judge and a jury venire prior to impanelment is a protected "trial stage." Since we need not decide this abstract issue here, we may simply assume that criminal defendants have the right to be present whenever the district judge addresses a jury venire. See United States v. Gagnon, 470 U.S. 522, 527 (1985).

The government asserts that our review is only for plain error because appellants waived their right to be present while the court communicated with the jury venire. Although the district judge informed the parties that he would thank the jurors for their service and answer questions about the differences between federal and state judges, he did not limit his remarks to those topics. Defense counsel only learned what the district court actually said to the venire at the appeals stage, but at pretrial they had agreed to the court's meeting with the jurors while the attorneys exercised their strikes. Thus, plain error review may not apply. Cf. United States v. Smith, 771 F.3d 1060, 1063 (8th Cir. 2014).

We review whether a district court "conducted a proceeding in violation of defendants' right to be present during every stage of trial under an abuse of discretion standard." United States v. Barth, 424 F.3d 752, 762 (8th Cir. 2005). If a proceeding was conducted in violation of that right, "it is subject to harmless error analysis." Id. Ex parte communications between judge and jury in the absence of and without notice to the defendant are "presumptively prejudicial." United States v. Koskela, 86 F.3d 122, 125 (8th Cir. 1996). Nevertheless, a "clear indication of an absence of prejudice" can overcome this presumption. Id. A defendant is not prejudiced by ex parte contacts between judge and jury that are merely ministerial in nature and not substantive communications. Shelton v. Purkett, 563 F.3d 404, 408 (8th Cir. 2009).

The district judge's comments went beyond the topics mentioned to counsel. He spoke of publicized criminal cases and subjects related to jury service such as jury nullification and common lawyer stereotypes. The Supreme Court has cautioned that an ex parte conversation between judge and jury is "pregnant with possibility for error." United States v. U.S. Gypsum Co., 438 U.S. 422, 460 (1978). An ex parte conversation with jurors by even an experienced trial judge may "generate unintended and misleading impressions of the judge's subjective personal views." Id. As the Supreme Court has explained, such contacts may cause the jury to misunderstand the law despite the good faith of the judge. See id. Our court has warned that "a trial judge should avoid ex parte communications with a jury," as words and stories can affect jurors in innumerable ways. United States v. Harris-Thompson, 751 F.3d 590, 597 (8th Cir. 2014). Potential problems may arise even though the court means no harm or such conversation is part of his "routine courtroom procedure." Moore v. Knight, 368 F.3d 936, 944 n.9 (7th Cir. 2004). Here, the district court's ex parte comments to the jury venire went beyond the topics previously identified to counsel and could be viewed as presumptively prejudicial. Nevertheless, a clear absence of prejudice may overcome any such presumption. See Koskela, 86 F.3d at 125.

On this appeal we have carefully examined the transcript of the court's meeting with the jury venire. Nearly all of the challenged comments were ministerial in nature and repeated instructions which jurors generally receive before and during trial. See United States v. Nelson, 570 F.2d 258, 261 (8th Cir. 1978). Although the court mentioned the "O.J. Simpson case" and "Marilyn Manson trial," he did not discuss the facts or the merits of either case. He simply cited them in order to explain the process of sequestration and the jury's right to discuss a case after trial, topics which appear in many instructional resources available to jurors. See, e.g., U.S. COURTS ADMINISTRATIVE OFFICE, HB100, HANDBOOK FOR TRIAL JURORS SERVING IN THE UNITED STATES DISTRICT COURTS (2014). While the court told the venire that he had the power to overrule a jury verdict if it appeared that jury nullification had occurred, he instructed at trial that the jury was prohibited from reaching a verdict through any means other than applying the "facts [to] the law." There is no indication in this record that any of the court's comments prejudiced appellants. See Shelton, 563 F.3d at 408; see also Nelson, 570 F.2d at 261.

Appellants argue that they were prejudiced by the judge's comment that lawyers are commonly stereotyped for "tricking jurors" and that juries "usually always make the right decision," but occasionally "take the law into their own hands." A defendant has the right to be present at an ex parte conversation between judge and jury only when "his presence is required to ensure fundamental fairness or a reasonably substantial opportunity to defend against the charge." Harris-Thompson, 751 F.3d at 597. At no point during his ex parte remarks did the district court discuss appellants' guilt or innocence, or any other "matter pending before the jury." Remmer v. United States, 347 U.S. 227, 229 (1954). The district court in fact asked the jury venire if it had any questions "as long as it [did not] reflect in any way on the case or anyone involved in the case that 14 of you are about to hear." The court's mention of jury nullification came in response to a question by a potential juror. The court commented that jurors rarely made mistakes and that any mistake was more likely made by a judge. We conclude that its pretrial comments did not affect appellants'

ability to defend against the charges.  See Gagnon, 470 U.S. at 526–27.  Now having been fully informed about what was said by the court to the jury venire, appellants have not shown they would have "gained anything by attending" the ex parte meeting. Harris-Thompson, 751 F.3d at 597.

After careful review of the record, we conclude that any violation of Rule 43(a)(2) or of appellants' constitutional rights in these circumstances would be nothing more than harmless error.  See Koskela, 86 F.3d at 125.  We therefore deny the request to remand for an evidentiary hearing or a new trial.

B.

In this case the government was required to prove for each of the charged offenses that appellants are "Indians" within the meaning of 18 U.S.C. § 1153.  Before trial Geshik Martin entered a stipulation with the government stating that "the following facts are true and the jury must treat these facts as having been proven at trial:  The defendant is an Indian."  The stipulation also provided that the "jury must treat this element of the offense as charged in Counts 1 through 5 of the Superseding Indictment as proven."  For the first time Martin now argues on appeal that the stipulation did not sufficiently establish his Indian status under § 1153 and that the district court erred in admitting the stipulation without ensuring that he had knowingly and voluntarily agreed to its admission.

When reviewing the sufficiency of the evidence, we look at the evidence in the light most favorable to the government and accept all reasonable inferences that support the verdict.  United States v. Anderson, 570 F.3d 1025, 1029 (8th Cir. 2009). The verdict will be upheld if "any interpretation of the evidence would allow a reasonable-minded jury to find the defendant guilty beyond a reasonable doubt." United States v. Teague, 646 F.3d 1119, 1122 (8th Cir. 2011).  Even if "the evidence adduced at trial rationally supports conflicting hypotheses, we [will] refuse to disturb

the conviction." United States v. Wilson, 619 F.3d 787, 795 (8th Cir. 2010). Because Martin did not move for judgment of acquittal, we review the sufficiency of the evidence for plain error. United States v. Tarnow, 705 F.3d 809, 813 (8th Cir. 2013).

Martin contends that the stipulation of fact was insufficient to prove his Indian status within the specialized meaning of § 1153 because it did not state that he had Indian blood or that he had been recognized as an Indian by the federal government or by an Indian tribe. Instead, the stipulation established only his racial status as an Indian. In order to be considered an "Indian" for purposes of § 1153, an individual must have "some degree of Indian blood and must be recognized as an Indian by an Indian tribe [or] the federal government." United States v. Stymiest, 581 F.3d 759, 764 (8th Cir. 2009). Although the stipulation did not identify these factors, it stated that Martin was an "Indian" for purposes of "the offense as charged" in the superseding indictment which identified § 1153 as the basis for each charge. Viewing the evidence in the light most favorable to the government as we must, and accepting all reasonable inferences supporting the verdict, we conclude that the stipulation established more than Martin's racial status as an Indian. The "clear purport of the stipulation" is his admission to Indian status under the statute. United States v. Nazarenus, 983 F.2d 1480, 1484 (8th Cir. 1993).

Martin also argues that the district court erred in admitting the stipulation because he had not knowingly and voluntarily agreed to its admission. As a mixed question of law and fact, we ordinarily review de novo the district court's determination that a defendant knowingly and voluntarily stipulated to an element of an offense. See United States v. Vest, 125 F.3d 676, 678 (8th Cir. 1997). Since Martin did not raise the issue before the district court, however, we review only for plain error. See United States v. Olano, 507 U.S. 725, 733 (1993); see also Fed. R. Crim. P. 52(b).

Stipulations to an element of a charged offense must be knowing and voluntary, but an inquiry as thorough as that required by Rule 11 of the Federal Rules of Criminal Procedure is not required. United States v. Stadler, 696 F.2d 59, 62 (8th Cir. 1982). A defendant knowingly and voluntarily enters into a stipulation to an element of a charged offense when the stipulation is "signed by [the defendant] and his attorney and entered in open court in the presence of the defendant." United States v. Armstrong, 206 F. App'x 618, 621 (8th Cir. 2006) (per curiam). Unless the defendant "indicates objection at the time the stipulation is made, he or she is ordinarily bound by such stipulation." United States v. Ferreboeuf, 632 F.2d 832, 836 (9th Cir. 1980) (collecting cases). Any other rule would unduly complicate trial by requiring judicial scrutiny into every stipulation of fact even when none is needed or required. See id.

To the extent Martin cites Stalder and Lawriw to suggest an alternative rule, he confuses the issues. In those cases the defendants had stipulated to "every fact alleged in the indictment, thereby effectively admitting [their] guilt." Stalder, 696 F.2d at 60; accord United States v. Lawriw, 568 F.2d 98, 105 n.13 (8th Cir. 1977). We have thus required "a careful inquiry on the record" to determine whether "the defendant knew what he was doing and understood the consequences of his stipulation." Stalder, 696 F.2d at 62. Because the record in Stalder showed that the defendant had agreed to the truth of the stipulated facts and that he had understood the consequences of his stipulations, we concluded that the district court "fully complied with this duty." Id. Such an intensive inquiry is not required here because Martin stipulated to only one fact—his Indian status. This case is thus quite different from Stalder.

Prior to trial Martin and his counsel signed a stipulation establishing that he was an Indian for purposes of each offense charged in the superseding indictment. At trial the government read the stipulation to the jury, and the district court asked whether counsel agreed to it. Counsel answered affirmatively. The court then entered the stipulation in evidence in Martin's presence. No objection was raised when the

stipulation was signed or at any time after it had been entered. Since Martin knowingly and voluntarily stipulated to his Indian status under § 1153, see Armstrong, 206 F. App'x at 621, we conclude that the district court committed no error in admitting the stipulation.

## C.

Before and during trial Robinson moved for a severance, and the district court denied each motion. Robinson now argues that the district court abused its discretion by denying the motions to sever his trial from that of his codefendants. See Fed. R. Crim. P. 8(b), 14. We will not reverse the denial of a motion to sever "unless the appellant demonstrates an abuse of discretion resulting in clear prejudice." United States v. Lewis, 557 F.3d 601, 609 (8th Cir. 2009). Clear prejudice occurs if a defendant's defense is "irreconcilable with the defense of a codefendant" and the jury will "unjustifiably infer that this conflict alone demonstrates that both are guilty." United States v. Sandstrom, 594 F.3d 634, 644 (8th Cir. 2010); accord United States v. Delpit, 94 F.3d 1134, 1143 (8th Cir. 1996). A defendant may also establish an abuse of discretion resulting in clear prejudice if the "jury will be unable to compartmentalize the evidence as it relates to separate defendants." United States v. Shivers, 66 F.3d 938, 940 (8th Cir. 1995). The defendant carries a heavy burden to make either showing. United States v. Martin, 866 F.2d 972, 979 (8th Cir. 1989).

In Zafiro v. United States, the Supreme Court considered "whether Rule 14 [of the Federal Rules of Criminal Procedure] requires severance as a matter of law when codefendants present mutually antagonistic defenses." 506 U.S. 534, 535 (1993). The Court rejected the petitioners' request to adopt a bright line rule "mandating severance whenever codefendants have conflicting defenses." Id. at 538. It reasoned that "[m]utually antagonistic defenses are not prejudicial per se," and the only time a court should sever a trial is when "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a

-13-

reliable judgment about guilt or innocence. " Id. at 538–39. The Court concluded that the petitioners had not been prejudiced by the consolidated trial because the government "offered sufficient evidence as to all four petitioners" that was independent of the conflicting defenses. Id. at 540. It also noted that even if there had been a risk of prejudice, the court cured it by instructing the jury that "[e]ach defendant is entitled to have his or her case determined from his or her own conduct and from the evidence [that] may be applicable to him or her." Id. at 541.

Like the petitioners in Zafiro, Robinson argues that he suffered clear prejudice because his trial defense contradicted those of his codefendants. While Robinson denied having been at Roy's home when the murders occurred, Geshik and David Martin testified that all three of them had been present at the home but had not participated in the murders or had acted in self defense. Even if we were to conclude that their defenses were mutually antagonistic and irreconcilable, severance would not have been required because such "conflict alone" would not have caused the jury to infer that both Robinson and his codefendants were guilty. Delpit, 94 F.3d at 1143. Here, as in Zafiro, the government offered evidence independent of the conflicting defenses to prove that Robinson had committed robbery and murder in violation of § 1153. Stately testified that when she had arrived at Roy's home, Robinson had walked toward the home with Geshik Martin, David Martin, George Martin, and Needham. She also claimed that Robinson did not have a firearm when he had traveled to Roy's home, but he was carrying one when he returned. Moreover, Ray Brown, Robinson's cellmate at the Sherburne County Jail, testified that Robinson had told him that he was in custody because he had "robbed a male and a female" of "some drugs and some money" and had "stabbed the female" with a knife. Finally, Anne Beaulieu, Robinson's then girlfriend, testified that he had blood on his clothes when he returned from Roy's home. We conclude that it was such evidence, rather than any conflict between Robinson's defense and those of his codefendants, which was the basis for the jury's verdict.

The district court cured any remaining risk of prejudice when it instructed the jury that "[e]ach defendant is entitled to have his case determined from evidence as to his own acts, statements, and conduct and any other evidence in the case which may be applicable to him." The court also went beyond the instructions in Zafiro when it said that even if "you find one defendant guilty or not guilty of one of the offenses charged [this] should not control your verdict as to any other offense charged against that defendant or against any other defendant." It then instructed that "[y]ou must give separate and individual consideration to each charge against each defendant . . . [and you] must consider each instruction given by the Court to apply separately and individually to each defendant on trial in this case." Given these instructions and all the evidence specifically related to Robinson's case, the district court did not abuse its discretion by denying a severance based on his claim of mutually antagonistic defenses.

Robinson next asserts that even if he was not prejudiced by mutually antagonistic defenses, he was denied a fair trial because the jury was unable to compartmentalize the evidence against him. When assessing the ability of a jury to separate evidence against codefendants, we consider "the complexity of the case, whether any of the defendants was acquitted, and the adequacy of the jury instructions." United States v. Casteel, 663 F.3d 1013, 1018 (8th Cir. 2011). Only in an unusual case will any prejudice resulting from the ability of a jury to separate evidence be "substantial enough to outweigh the general efficiency of joinder." United States v. Al-Esawi, 560 F.3d 888, 891 (8th Cir. 2009). This is not such a case.

While this case had some complexities, the verdicts showed that the jury was able to consider the evidence separately against each defendant. Unlike Robinson and Geshik Martin, David Martin was acquitted of the murder charges and George Martin was acquitted on all charges. The district court had instructed the jury to give "separate and individual consideration to each charge against each defendant" and to consider "each instruction given by the Court to apply separately and individually to

-15-

each defendant." See United States v. Ghant, 339 F.3d 660, 666 (8th Cir. 2003). These "careful and thorough" instructions addressed any risk of prejudice created by the complexity of the case. Casteel, 663 F.3d at 1019. Martin failed to show that any prejudice from a joint trial was substantial enough to outweigh the efficiency of joinder. We thus conclude that the district court did not abuse its discretion by denying the motions to sever.

Robinson finally argues that the government violated his Fifth Amendment right to remain silent by commenting on his failure to testify. In her closing argument the prosecutor stated that "the only people that are actually going to talk about what occurred at the house are Geshik Martin and David Martin. That is who you heard from." District courts have broad discretion to supervise closing arguments, United States v. Littrell, 439 F.3d 875, 881 (8th Cir. 2006), and a conviction will be reversed for an improper statement only for some clear abuse, United States v. Davis, 534 F.3d 903, 914 (8th Cir. 2008). When an appellant has failed to object to an argument in the district court, its propriety is reviewed only for plain error and reversed "only under exceptional circumstances." Id. The Fifth Amendment forbids direct comment by the government on a defendant's failure to testify, or any indirect references to it if motivated by an "intent to call attention to a defendant's failure to testify or would be naturally and necessarily taken by a jury as a comment on the defendant's failure to testify." Graham v. Dormire, 212 F.3d 437, 439 (8th Cir. 2000) (citing Griffin v. California, 380 U.S. 609, 615 (1965)). Both tests require attention to the entire context of the remarks, including "the argument itself, and the larger context of the evidence introduced at trial." United States v. Durant, 730 F.2d 1180, 1184 (8th Cir. 1984).

While Robinson concedes that the challenged remarks were not direct comments on his failure to testify, he maintains that the prosecutor indirectly commented on it when she stated that Geshik Martin and David Martin were the only defendants who had testified at trial. The government responds that its closing

remarks were intended to call attention to the incredibility of Geshik Martin rather than to Robinson's silence. The context of the closing argument supports this explanation. Immediately after the prosecutor commented that Geshik and David Martin were the only defendants who had testified, she asked the jury to "evaluate the testimony of Geshik Martin" carefully because "his account of events just is incredible." She then identified numerous "internal inconsistencies" in his testimony in order to disprove his theory of self defense. Considered as a whole, the prosecutor's closing remarks were structured to rebut Martin's testimony, not to call attention to Robinson's silence. See United States v. Porter, 687 F.3d 918, 922 (8th Cir. 2012).

We also conclude that the jury would not have "naturally and necessarily" viewed the prosecutor's remarks as a comment on Robinson's failure to testify. The jury must have been aware of the government's strategy to impeach Geshik Martin's testimony after listening to his cross examination, so its closing argument was likely to have been understood by the jury as a critique of Geshik Martin's theory of self defense. See Durant, 730 F.2d at 1184. The Supreme Court has warned that "a court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations." Donnelly v. DeChristoforo, 416 U.S. 637, 647 (1974). In the context of this trial, the prosecutor's remarks were not improper and the district court did not plainly err in failing to strike them.

D.

Prior to jury deliberations David Martin proposed a lesser included offense instruction on theft, and the district court declined to give it. Martin now argues that the district court erred in refusing his request. We review the decision for an abuse of discretion. United States v. Anthony, 537 F.3d 863, 866 (8th Cir. 2008). A defendant is entitled to a lesser included offense instruction if: (1) a proper request

is made; (2) the lesser offense is identical to part of the greater offense; (3) there is some evidence that would justify conviction of the lesser offense; (4) the proof of an element differentiating the two crimes is sufficiently disputed so that the jury might consistently find the defendant innocent of the greater and guilty of the lesser offense; and (5) there is mutuality. E.g., United States v. Short, 805 F.2d 335, 336 (8th Cir. 1986). We will generally affirm a district court's refusal to instruct the jury on a lesser included offense when the defendant has claimed innocence throughout trial. See United States v. Knox, 634 F.3d 461, 464 (8th Cir. 2011) (collecting cases).

In United States v. Collins, for example, we affirmed the district court's refusal to give a lesser included offense instruction of possession of a controlled substance when the defendant had claimed "complete innocence" to simple possession and possession with intent to distribute. 652 F.2d 735, 742 (8th Cir. 1981). We reasoned that there was no rational basis for instructing the jury on the lesser offense because "the jury either believed [the defendant] had nothing to do with the transaction or was guilty as charged." Id. Although Collins involved different factual circumstances than here, the same general principle applies. Indeed, in Knox, we found "no reason not to apply this general rule" to a request for a lesser included instruction of simple assault when the defendant had claimed complete innocence at trial. 634 F.3d at 464.

As in Collins and Knox, Martin maintained complete innocence at trial. During opening statements his counsel asserted that he had not committed or intended to commit robbery or theft. According to counsel, Martin had intended to take only "what [was] rightfully his," namely some clothes he had left at Roy's home and a "share of crack" Roy owed him. Martin similarly claimed innocence throughout his testimony. He testified that he was innocent of the charged offenses because "he didn't go [to Roy's home] for no confrontation." He had gone there "just to get [his] clothes." Martin also denied taking any money or crack cocaine from Roy that night, discarding his clothes after returning from Roy's home, or participating in any crime that may have been committed. If the jury had credited Martin's version of the events,

it would have acquitted him of all charges. As a result, the jury could not have acquitted him of robbery but convicted him of theft. See, e.g., United States v. Milk, 281 F.3d 762, 771 (8th Cir. 2002). The district court thus did not abuse its discretion in refusing to give the theft instruction.

Martin also argues that the district court erred by considering acquitted conduct in applying a six level enhancement to his sentence for infliction of permanent bodily injury under U.S.S.G. § 2B3.1(b)(3)(C). In United States v. Whatley, we recognized that "a sentencing court may consider the conduct underlying an acquitted charge 'so long as that conduct has been proved by a preponderance of the evidence.'" 133 F.3d 601, 606 (8th Cir. 1998) (citing United States v. Watts, 519 U.S. 148, 157 (1997)). Since then we have "repeatedly held that due process never requires applying more than a preponderance of the evidence standard for finding sentencing facts, even where the fact-finding has an extremely disproportionate impact on the defendant's advisory guidelines [sentencing] range." United States v. Mustafa, 695 F.3d 860, 862 (8th Cir. 2012). Our well established precedent thus disposes of this sentencing challenge. See id.

Martin finally contends that the district court erred in applying the six level enhancement because he could not have foreseen that the robbery would result in "permanent or life threatening bodily injury." U.S.S.G. § 2B3.1(b)(3)(C). We review the district court's findings on the issue for clear error. See United States v. Spotted Elk, 548 F.3d 641, 677 (8th Cir. 2008). Only if we have a "definite and firm conviction that a mistake has been made, will [we] reverse the sentencing court's factual findings." United States v. Two Elk, 536 F.3d 890, 909 (8th Cir. 2008).

At sentencing the district court found that "[e]veryone knew, if not a murder, [there] would be violence in [Roy's] home and there would be injury in that home to one or both parties." The record supports those findings. At trial Martin testified that Roy was "very angry," "liked to scream and yell," and that he and Roy had "gotten

into it a couple of times" in the past. Martin also knew that Roy had attacked his girlfriend, Vicki Neadeau, just a few hours before the robbery. He testified that her "arm was in a sling [and] she had some kind of cut or bruise on her forehead" as a result of Roy's attack. Moreover, Martin had informed the other defendants while they were planning revenge that he knew Roy owned a gun and where he stored his cocaine. Martin then traveled to Roy's home aware of his proclivity for "violence." On this record the district court did not clearly err in finding that Martin "knew [there] was going to be violence" at the home. The six level enhancement for infliction of permanent or life threatening injury was thus properly applied to his sentence.

III.

Based on the above, we affirm the judgments of the district court.

_____