# United States Court of Appeals
### For the Eighth Circuit

_____

No. 14-2887
_____

United States of America

*Plaintiff - Appellee*

v.

Michael Clayton

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Northern District of Iowa - Ft. Dodge

_____

Submitted: April 17, 2015
Filed: June 1, 2015

_____

Before BYE and SMITH, Circuit Judges, and SCHILTZ,[1] District Judge.

_____

SCHILTZ, District Judge.

On the morning of February 7, 2013, a robber stole $11,284 from Citizens State Bank in Fort Dodge, Iowa. A jury convicted Michael Clayton of the robbery and the

_____

[1]The Honorable Patrick J. Schiltz, United States District Judge for the District of Minnesota, sitting by designation.

district court[2] sentenced Clayton to 129 months' imprisonment. Clayton appeals his conviction and sentence. We affirm.

## I. BACKGROUND

The government's case against Clayton rested in large part on the testimony of his accomplice, Christopher Anderson. Anderson and Clayton share a common connection with a third man, Terrell Newman. Anderson and Newman were part of the same drug-trafficking organization and also ran a restaurant together. Clayton is Newman's cousin. Clayton, Anderson, and Newman all live in or near Omaha.

In February 2013, Newman was in jail facing criminal charges. At trial, Anderson testified that Clayton asked Anderson to drive to Fort Dodge, where Clayton was visiting his sister. According to Anderson, Clayton said that he needed Anderson to give him a ride back to Omaha and that he had something that would help Newman.

Anderson drove to Fort Dodge on February 6, arriving sometime around midnight. Anderson's first stop in Fort Dodge was at a gas station, where a security camera captured his image. Anderson then went to Clayton's sister's house, where he and Clayton spent the rest of the night.

The next morning, Clayton directed Anderson to drive to an apartment complex near Citizens State Bank. After Anderson parked in the complex, Clayton got out of the car and made a phone call on Anderson's cell phone. Anderson could not hear what Clayton was saying, but it sounded like an argument. Other evidence established that Anderson's phone was used on the morning of February 7 to make

---

[2]The Honorable Mark W. Bennett, United States District Judge for the Northern District of Iowa.

two threatening calls: one to a local school, and one to an individual whose number was listed in the telephone directory just below that of another local school. (Presumably, the purpose of the calls was to create a distraction for local law enforcement.) After finishing his calls, Clayton tossed the phone back into Anderson's car and walked away, saying that he would return shortly.

As noted, Citizens State Bank was robbed that morning. Witnesses at the bank testified that the robber first approached a customer, said that he had a gun, and demanded that the customer get on the floor. The robber then instructed a teller to fill a bag with cash. The cash that the teller placed in the bag included five "bait bills" — that is, bills that had been photographed and whose serial numbers had been recorded. Witnesses saw the robber leave the bank on foot and walk north in the direction of the apartment complex where Anderson was parked. Witnesses described the robber as a black man of medium build between 5'6" and 5'8" who wore a mask and glasses. Clayton is black and 5'10" tall; Anderson is white.

About five minutes after leaving Anderson's car, Clayton returned, carrying a bag. The two men then drove to Omaha. Along the way, Clayton broke Anderson's phone and tossed it out of the window. Clayton also discarded his shoes in a dumpster and called a friend to ask for new shoes. An analysis of the cell towers to which Clayton's phone connected that day established that the phone traveled from Fort Dodge to Omaha. Anderson's phone similarly traveled from Fort Dodge toward Omaha, but, after connecting to a cell tower about halfway between Fort Dodge and Omaha, the phone stopped being used.

On arriving in Omaha, the men went to the home of Ayeshia McDonald, who was Newman's girlfriend. Clayton emptied the bag, which was full of cash, onto a table. Anderson testified that Clayton gave him $1,000, after which Anderson left. Anderson understood that a large portion of the cash was to be set aside for Newman's legal fees. McDonald, who also testified at trial, corroborated Anderson's

testimony that Clayton and Anderson brought money to her house, although she could not remember the exact date. A later search of McDonald's home turned up a roll of cash that contained four of the bait bills that were taken during the bank robbery.

At sentencing, the district court found that the United States Sentencing Guidelines recommended a prison sentence of between 84 and 105 months. The government moved for an upward departure or variance on a number of grounds, including that one of Clayton's previous state convictions — a conviction for third-degree theft — involved violent threats. The presentence investigation report (PSR) described the offense conduct for that conviction as follows:

> The Complaint reflects the defendant entered Mr. Money and threatened to shoot the occupants of the building. He also claimed he had a bomb which would explode if anyone attempted to call the police. The clerks allowed him to empty the drawers and he left on foot. The defendant was wearing a pair of sunglasses and a white surgical or dust mask.

PSR ¶ 29.

Clayton did not dispute the fact of the prior conviction, but he objected to the PSR's description of the underlying offense conduct. At Clayton's sentencing hearing, Barbara Gordon, a clerk who was present during the robbery of Mr. Money, testified consistently with the description in the PSR. Gordon described the robber as a black man wearing an asthma mask and recounted how he threatened to shoot the employees, forced them to get on the floor, and warned them that he had rigged a bomb that would explode if they tried to use the phone.

-4-

In addition to Gordon's testimony, the district court admitted several exhibits relating to the Mr. Money robbery, including minutes of testimony from the Iowa criminal proceedings.[3] The minutes stated, among other things, that police officers found a white mask along the route that the robber had taken when he fled Mr. Money; that DNA from the mask matched DNA obtained from Clayton; and that witnesses made a photo identification of Clayton.

Clayton argued that, because Gordon did not identify him during her testimony, there was insufficient evidence to establish the identity of the person who had made violent threats while robbing Mr. Money. The district court rejected that argument, holding that the minutes, together with Gordon's testimony, established by a preponderance of the evidence that Clayton had made the threats. The district court then granted the government's motion for an upward variance, citing Clayton's unscored criminal convictions, his threats during the Mr. Money robbery, and the threatening calls he made just before robbing Citizens State Bank.

## II. ANALYSIS

### A.

Clayton first argues that he is entitled to a new trial because law-enforcement officers improperly coached Anderson and McDonald, thereby tainting their testimony and violating Clayton's right to due process.

Under Fed. R. Crim. P. 33(a), "the court may vacate any judgment and grant a new trial if the interest of justice so requires." Following the lead of the parties and

---

[3]Minutes of testimony (also called minutes of evidence) are required under Iowa law and represent the prosecutor's summary of the evidence that she expects to present at trial. Iowa R. Crim. P. 2.4(6).

the district court, we review Clayton's claims of improper coaching under the standard applicable to allegations of prosecutorial misconduct.[4] Under this standard, the defendant must show that the government's conduct was improper and that it "'affected the defendant's substantial rights so as to deprive him of a fair trial.'" *United States v. Hunter*, 770 F.3d 740, 743 (8th Cir. 2014) (quoting *United States v. New*, 491 F.3d 369, 377 (8th Cir. 2007)).

Clayton argues that officers improperly fed Anderson facts about the robbery during a February 25, 2013 interview, after which (according to Clayton) Anderson shaped his statements to conform to those facts. During that interview, Anderson initially denied involvement in the robbery. After the officers told Anderson that they knew that he was in Fort Dodge on the day of the robbery and that he had parked near the bank, Anderson admitted that he had traveled to Fort Dodge to help Clayton commit a crime. Also during the February 25 interview, the officers asked Anderson whether Clayton wore glasses on the day of the robbery. After Anderson stated that he could not remember, the officers showed him a picture of Clayton wearing glasses. In a later interview, Anderson claimed to remember that Clayton had worn glasses.

We agree with the district court that, as a general matter, it is not improper for law-enforcement officers to confront an alleged accomplice with facts and evidence undermining the accomplice's denials in order to persuade the accomplice to cooperate. We do not believe that the officers' conduct with respect to Anderson amounted to improper coaching. Even if it did, though, Clayton cannot show any resulting prejudice. The February 25 interview was recorded and disclosed to

---

[4]To be clear, Clayton does not allege that the prosecutor himself engaged in any improper conduct. But because the parties do not dispute the applicable standard of review, we assume, without deciding, that the standard applicable to allegations of prosecutorial misconduct should apply. We note that it is questionable whether police misconduct that occurred prior to prosecutorial involvement may be grounds for a prosecutorial-misconduct claim.

Clayton. Clayton used the interview to full effect both in his cross-examination of Anderson and during his closing argument, noting every inconsistency and repeatedly getting Anderson to admit that he had lied. *Cf. United States v. Nambo-Barajas*, 338 F.3d 956, 962-63 (8th Cir. 2003) (no error in denying motion for a new trial where alleged witness coaching was covered during cross-examination). Moreover, as discussed below, crucial details of Anderson's testimony were corroborated by other evidence. Any improper coaching of Anderson did not prejudice Clayton.

Clayton also alleges that officers acted improperly during a September 20, 2013 interview of McDonald. During that interview, officers told McDonald that they were tired of "spoon feeding" her details of the crime; that she needed to get on the "same page" as Anderson; and that she would get more "bang for her buck" (meaning more credit against her own impending sentencing) if she testified against Clayton.

We will assume, for the sake of argument, that the conduct of the law-enforcement officers with respect to McDonald amounted to improper coaching. It is clear, however, that Clayton was not prejudiced by that conduct. To begin with, McDonald's testimony was much less important than Anderson's; her only value was to corroborate Anderson's testimony that Clayton and Anderson brought the stolen money to her house in Omaha. It is true, as Clayton argues, that McDonald's story changed over time. At her initial February 2013 interview, McDonald told the officers that Anderson alone had brought the money to her house. Later, McDonald changed her story and said that Clayton had also brought the stolen money to her house. Critically, McDonald changed her story long *before* the September 20 interview at which the alleged improper coaching occurred. Further, the prosecutor voluntarily refrained from eliciting any testimony from McDonald that could have been tainted by the officers' conduct at the September 20 interview. And, as he did with respect to Anderson, Clayton freely used McDonald's inconsistent statements to impeach her testimony.

-7-

For these reasons, we conclude that any improper coaching of either Anderson or McDonald had no effect on the outcome of the trial. The district court did not err in denying Clayton's motion for a new trial due to improper witness coaching.

## B.

Clayton next argues that he is entitled to a judgment of acquittal because there was insufficient evidence to convict him. We review the district court's denial of a motion for judgment of acquittal de novo. *United States v. Turner*, 781 F.3d 374, 392 (8th Cir. 2015). "[W]e look at the evidence in the light most favorable to the government and accept all reasonable inferences that support the verdict." *United States v. Martin*, 777 F.3d 984, 992 (8th Cir. 2015). "The verdict will be upheld if 'any interpretation of the evidence would allow a reasonable-minded jury to find the defendant guilty beyond a reasonable doubt.'" *Id.* (quoting *United States v. Teague*, 646 F.3d 1119, 1122 (8th Cir. 2011)).

As discussed below, the testimony of Anderson and McDonald, together with the evidence corroborating it, gave the jury ample grounds for convicting Clayton. Clayton attacks some of Anderson's and McDonald's testimony as illogical or unbelievable, but whether to believe that testimony was up to the jury. *United States v. Funchess*, 422 F.3d 698, 701 (8th Cir. 2005) ("[W]e do not consider attacks on witnesses' credibility when we are evaluating an appeal based upon the sufficiency of evidence."); *United States v. Chavez*, 230 F.3d 1089, 1091 (8th Cir. 2000) ("Questions of credibility are the province of the jury."). The district court did not err in denying Clayton's motion for acquittal.

## C.

Clayton next argues that he is entitled to a new trial because the verdict was against the weight of the evidence. In evaluating a motion for a new trial on this

basis, the district court is not required to view the evidence in the light most favorable to the verdict; instead, the district court may weigh the evidence and judge witness credibility for itself. *United States v. Samuels*, 543 F.3d 1013, 1019 (8th Cir. 2008). Nevertheless, motions for a new trial are generally disfavored, and the court "must exercise [this] authority 'sparingly and with caution.'" *United States v. Campos*, 306 F.3d 577, 579 (8th Cir. 2002) (quoting *United States v. Lincoln*, 630 F.2d 1313, 1319 (8th Cir. 1980)). "The jury's verdict must be allowed to stand unless 'the evidence weighs heavily enough against the verdict [such] that a miscarriage of justice may have occurred.'" *United States v. Johnson*, 474 F.3d 1044, 1051 (8th Cir. 2007) (alteration in original) (quoting *United States v. Lacey*, 219 F.3d 779, 783 (8th Cir. 2000)). We review the district court's denial of the motion for an abuse of discretion. *United States v. Vore*, 743 F.3d 1175, 1181 (8th Cir. 2014).

Clayton argues that the verdict was against the weight of the evidence because Anderson and McDonald were not credible witnesses. The inconsistencies and contradictions in their stories, however, are mostly attributable to their initial attempts to avoid admitting any knowledge of the robbery. Moreover, Anderson's and McDonald's testimony was corroborated in important respects by other evidence. There is no doubt, for example, that Anderson drove to Fort Dodge on February 6; that Anderson's phone was used to make threatening phone calls shortly before the robbery; that Clayton's phone traveled from Fort Dodge to Omaha on February 7; that Anderson's phone traveled partway to Omaha that same day before it stopped connecting to cell towers; and that money from the robbery was recovered at McDonald's house in Omaha.

There is also no doubt that Anderson himself was *not* the robber; Anderson is white, and all of the eyewitnesses agreed that the robber was black. Consequently, Anderson cannot be accused of pointing a finger at Clayton in order to deflect culpability from himself. The robber clearly was someone other than Anderson; the only question was the identity of that person. Notably, it was Anderson, not law

enforcement, who first identified Clayton as the robber. Finally, Anderson's and Clayton's common connection to Newman further support Anderson's account of the robbery. As noted, Clayton is Newman's cousin, and Anderson was Newman's business associate and co-conspirator in a drug-trafficking organization. At the time of the robbery, Newman was in jail facing criminal charges. These undisputed circumstances strongly corroborate Anderson's testimony.

Given the evidence corroborating Anderson's and McDonald's testimony, the jury was justified in crediting that testimony despite the prior inconsistent statements. The district court did not abuse its discretion in denying Clayton's motion for a new trial.

D.

Finally, Clayton argues that the district court improperly relied on minutes of testimony from an Iowa criminal proceeding to find that Clayton had previously robbed a Mr. Money store and had made violent threats during that robbery. Because the district court relied on these findings in imposing a sentence above the Guidelines range, Clayton argues that this case should be remanded for resentencing.

We confess to being somewhat confused by Clayton's contention that there is a dispute over the identity of the Mr. Money robber.[5] The identity of the robber was

---

[5]Clayton seems to be suggesting that he did not actually rob Mr. Money, but decided to enter an *Alford*-type plea because he was offered a favorable plea deal. *See North Carolina v. Alford*, 400 U.S. 25 (1970). Even if that is true, Clayton has nevertheless been convicted under Iowa law and cannot now avoid the consequences of that conviction. *See United States v. Cover*, 703 F.3d 477, 482 (8th Cir. 2013) (*Alford* pleas are treated the same as other guilty pleas in determining whether a conviction is a predicate offense for sentence-enhancing purposes); *State v. Knight*, 701 N.W.2d 83, 89 (Iowa 2005) ("[T]he defendant entering an *Alford* plea amidst claims of innocence is no different than a defendant found guilty amidst claims of

conclusively established by Clayton's conviction for third-degree theft in connection with the robbery. There is no evidence or suggestion that there was more than one robber, or that the theft offense to which Clayton pleaded guilty involved some crime other than the Mr. Money robbery. By virtue of Clayton's conviction, the district court had all of the evidence it needed to find that Clayton was the man who robbed the Mr. Money store. The only dispute concerned the offense conduct as described in the PSR.

To resolve that dispute, the government presented the live testimony of Barbara Gordon, a Mr. Money employee who witnessed the robbery. Gordon described a single robber who wore a mask and made threats about a gun and a bomb. The district court expressly found Gordon's testimony credible. Nothing more was needed to establish that Clayton made violent threats while robbing Mr. Money. His identity was established by his conviction, and his conduct was established by Gordon's testimony. Thus, the minutes are essentially irrelevant.

In any event, the district court did not err in relying on the minutes. Sentencing proceedings are not subject to the Federal Rules of Evidence. Fed. R. Evid. 1101(d)(3); *United States v. Mohamed*, 757 F.3d 757, 760 (8th Cir. 2014). "'A district court has wide discretion at sentencing as to the kind of information considered or its source,' and it may consider uncorroborated hearsay evidence so long as the evidence has sufficient indicia of reliability to support its accuracy and the defendant is given a chance to rebut or explain it." *United States v. Garcia*, 774 F.3d 472, 475 (8th Cir. 2014) (quoting *United States v. Atkins*, 250 F.3d 1203, 1212-13 (8th Cir. 2001)).

_____

innocence."). To the extent that Clayton may be suggesting that the district court could only consider the violent threats if Clayton was actually convicted of making those threats, his argument is meritless. In deciding whether to vary from the Guidelines range, the district court was entitled to rely on evidence other than the conviction itself to establish the nature of Clayton's underlying conduct.

We emphasize that the question here is not whether the minutes — in and of themselves — were sufficient to support the findings of the district court. The question is whether the findings of the district court were supported by evidence that, taken as a whole, was sufficiently reliable. The district court did not rely on the minutes alone in finding that Clayton made violent threats in the course of robbing the Mr. Money store. Instead, the district court considered those minutes together with other evidence of Clayton's culpability, including Clayton's guilty plea, Gordon's testimony, and the fact that Clayton's Iowa sentence required him to pay restitution to Gordon. Taken as a whole, the evidence was sufficient to support the findings of the district court that Clayton committed the Mr. Money robbery and made violent threats during the course of that robbery.

\* \* \*

For these reasons, Clayton's conviction and sentence are affirmed.

_____